# United States Court of Appeals
## For the First Circuit

No. 02-2643

SYLVIA I. CALERO-CEREZO,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Perez-Gimenez, U.S. District Judge]

Before

Selya, Circuit Judge,
Lipez, Circuit Judge,
and Ponsor*, District Judge.

Sylvia I. Calero-Cerezo, pro se.

Fidel A. Sevillano-Del Rio, Assistant United States Attorney,
with whom H.S. Garcia, United States Attorney, and Miguel A.
Fernandes, Assistant United States Attorney, were on brief for the
United States.

January 14, 2004

*Of the District of Massachusetts, sitting by designation.

**PONSOR, District Court Judge**.  This cases raises, among other issues, the knotty question of how far the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 et seq., requires an employer to go to accommodate an employee whose disability – clinically diagnosed major depression – has affected, in some respects, her ability to function in the workplace.  The trial judge, grappling with claims under several statutes, granted summary judgment for defendants on all the plaintiff's causes of action.  Because we find that the record, viewed in the light most favorable to the appellant, might support a claim under the Rehabilitation Act, and (equally importantly) that appellees' counsel has entirely failed to address either the facts or the law buttressing this claim, we are constrained to reverse and remand for further proceedings.

## I. Procedural Background

A brief review of the procedural history of this case will serve to put the issues in context.

After pursuing administrative remedies starting in 1998, plaintiff-appellant, Sylvia I. Calero-Cerezo ("Calero"), an attorney employed by the Immigration and Naturalization Service ("INS") proceeding pro se, filed her complaint in the United States District Court on October 4, 1999. The defendants were the United States Department of Justice ("DOJ"), the INS, then-Attorney General Janet Reno, and then-Commissioner of the INS Doris Meissner.  Amended

complaints followed in May 2000 and May 2002. Perhaps because plaintiff was representing herself, the precise causes of action were rather hard to discern from the pleadings. Plaintiff now asserts that, while she may have included additional theories in her administrative proceedings, her complaint and amended complaints as submitted to the district court were intended to encompass only two claims: (1) a claim for failure to accommodate her disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.,[1] and the Rehabilitation Act, and (2) a claim for retaliation under Title VII, 42 U.S.C. § 2000e et seq.

Eventually the parties filed cross-motions for summary judgment, and on September 18, 2002, the district court issued its opinion granting the defendants' motion and denying the plaintiff's. In his memorandum, the district court judge conscientiously addressed all causes of action that might reasonably have been inferred from the plaintiff's less than artfully drafted pleadings, including claims for discrimination based on gender, national origin and age, which the plaintiff has not pursued, as well as the claims for failure to accommodate and for retaliation, which the plaintiff

---

[1] This opinion will concentrate almost entirely on the Rehabilitation Act, since the ADA is not available to federal employees. Rivera v. Hayman, 157 F.3d 101, 103 (2d Cir. 1998). The same standards, however, apply to claims under the ADA and under the Rehabilitation Act. Oliveras-Sifre v. Puerto Rico Dep't of Health, 214 F.3d 23, 25 n.2 (1st Cir. 2000). The elimination of the ADA claim does not, therefore, affect the legal analysis or the scope of remedy available to the plaintiff.

has continued to press on this appeal. Specifically, with regard to plaintiff's claim for failure to accommodate her disability, the district court suggested, first, that "depression per se" is not a recognized disability, then went on to conclude that, in any event, the record conclusively indicated that plaintiff could not perform the legitimate requirements of her position, and moreover that plaintiff's requested accommodation was not feasible.

On November 15, 2002, Calero filed her Notice of Appeal, challenging only the district court's rulings regarding her claims for failure to accommodate and for retaliation. Despite clear notification of the scope of this appeal, and further confirmation in the appellant's brief, appellees' counsel has inexplicably treated this appeal as though it involved merely a garden variety claim of discrimination under Title VII. No significant discussion whatever addresses Calero's claim – the heart of her case – that the defendants failed to make any reasonable effort to accommodate her disability. This neglect has played a substantial part in the court's decision to remand.

## II. Factual Background

We recount the facts in the light most favorable to Calero, the party opposing summary judgment. Motorsport Eng'g, Inc. v. Maserati SPA, 316 F.3d 26, 28 (1st Cir. 2002).

Calero began practicing law in 1977 in Puerto Rico's Department of Justice. Later, she worked for private firms and

agencies in Puerto Rico, and, from 1993 to 1995, in East Hartford, Connecticut with the Federal Deposit Insurance Corporation. In 1995, Calero was hired as an assistant district counsel in the New York District Office of the INS' Office of the General Counsel ("OGC"). Her performance was rated "excellent" in her 1996-97 appraisal, and in May 1997 Calero successfully petitioned for a transfer to the San Juan District Office of the OGC, where she began working part-time as an assistant district counsel. Nothing in the record suggests that Calero, up to this point in her twenty-year career as an attorney, had ever encountered significant difficulties in performing her job at or above the level of her employers' expectations.

During the summer of 1997, Calero began to suffer from tension headaches and lethargy, the first sign of the onset of a disability that was soon to erode her capacity to function without accommodation. On January 16, 1998, Dr. Roberto Rodriguez ("Dr. Rodriguez") diagnosed Calero with a recurrence of depression and prescribed the antidepressant Paxil. Calero had suffered previously from depression, in 1990 when her mother and father died and again in 1992 upon the death of her brother. The record does not suggest, however, that at these earlier times her depression interfered with her capacity to work.

In February 1998, Calero began working full-time at the San Juan District Office. One month later, and two months following

her diagnosis of depression, Calero's emotional fragility catapulted her into the first of a series of acrimonious episodes with her supervisor Vivian Reyes-Lopez ("Reyes"). Before summarizing the evidence related to these incidents, two observations about the state of the record are appropriate.

First, in recounting her conflicts with Reyes, plaintiff's pro se papers sometimes appear to suggest that Calero's problems at work derived not from a failure to accommodate her disability, but simply from Reyes' general unfairness to her. To the extent Calero might succeed in placing blame for her problems at work on Reyes personally, she may vindicate her own virtue but doom her case. The Rehabilitation Act is not, of course, designed to provide a worker a remedy against an arbitrary supervisor, per se. It is designed to insure that a capable, disabled worker, covered by the statute, is not deprived of the opportunity to work and earn a living due to the refusal of the employer to make a reasonable accommodation. Viewed in the light most favorable to the plaintiff, therefore, the summary below will concentrate on facts that a reasonable factfinder might find supportive of this statutory claim, and not on Calero's occasional self-justifying suggestions that it was Reyes, not she, who was responsible for their ongoing problems.

Second, we are aware in recounting this background that a reasonable factfinder might conclude that Calero's friction with her supervisor (and, as will be seen, others including family and

friends) might be explained on the ground that she was simply a very difficult, not a disabled, person. In the context of summary judgment, however, we must respect the role of the factfinder to choose between alternative, reasonably supported inferences. Since the factual mosaic, seen from plaintiff's perspective, might reasonably support a claim of disability, we summarize the facts in a manner consistent with that viewpoint.

The first episode of what was to be a lengthy series of problems between Calero and Reyes arose over what should have been a trivial matter. On March 9, 1998, Reyes denied Calero's request to make up a lost work hour during lunchtime. In response, Calero complained in a loud voice that Reyes was the worst supervisor she ever had and that Reyes treated her like a child. The outburst was vociferous enough to be overheard by other INS staff in the office.

The following day, March 10, 1998, Reyes asked Calero to come to her office to discuss the previous day's contretemps. At the meeting, Reyes told Calero that raising her voice in the office was not necessary. Calero responded with a further verbal attack, criticizing Reyes' supervisory skills, telling Reyes that she had a bad attitude, and suggesting that Reyes had lost an appointment as an immigration judge because of her poor professional ability.

A week later, on March 17, 1999, Calero consulted Dr. Filia S. Garcia, who referred Calero to a psychologist for evaluation of her "masked depression."

On March 18, 1998, Calero received a formal reprimand (a so-called memorandum of "admonishment") from Reyes for her behavior on March 9th and 10th.

The day following her receipt of this reprimand, Calero sent an e-mail message to Jack Penca ("Penca"), the Regional District Counsel and Reyes' immediate supervisor, who worked out of the Vermont office of the INS, regarding the recent friction with Reyes. Calero complained to Penca that Reyes was harassing her and that this daily harassment was affecting her emotionally. Calero informed Penca that she was taking the antidepressant Paxil "to be able to continue working." This was the first time Calero informed a supervisor that she was suffering from depression and was on medication for her condition.

In mid-April 1998, Calero was seen by psychiatrist Dr. Margarita Alonso Cedo ("Dr. Alonso"). On April 13th, Calero's condition was serious enough that Dr. Alonso recommended to Calero that she take a medical leave from work for the next three weeks. On April 17, 1998, Dr. Alonso diagnosed Calero with "major depression" and, like Dr. Rodriguez in January 1998, prescribed the antidepressant Paxil.

Significantly, Dr. Alonso also wrote a note to Calero's employer giving notice of Calero's condition and confirming her recommendation that Calero take a three-week break from work. After receiving two doctors' notes from Dr. Alonso explaining Calero's

diagnosis, medication and plan for treatment, Reyes approved Calero's sick leave, which lasted from April 14 to May 1, 1998.

On April 21, 1998, Calero contacted the Office of Equal Employment Opportunity, Immigration and Naturalization Service, U.S. Department of Justice ("EEO") in Washington, D.C. to inquire about filing a complaint for discrimination and harassment. On April 22, 1998, Calero contacted Dr. Ruth Prevor ("Dr. Prevor"), a psychologist with the INS Employee Assistance Office. Thereafter, Calero met with Dr. Prevor on several occasions to receive assistance regarding her mental disability.

Also on April 22nd, while Calero was on medical leave, Reyes left Calero two memoranda instructing Calero to complete certain tasks in preparation for her upcoming annual vacation. Reyes asked Calero to review her cases scheduled for hearings in the immigration court during her vacation and also to prepare a particular case to be discussed with Reyes before the vacation's starting date, which was May 22, 1998.

On May 7, 1998, after Calero returned from her medical leave but before she left for her annual vacation, Calero and Reyes met to discuss Calero's cases. Reyes had previously requested that Calero copy her on certain e-mail messages, and Calero again entered into a nasty argument with Reyes, this time about Reyes' concern that Calero was failing to follow Reyes' instructions. Calero told Reyes during this conversation that Reyes was reprimanding her as

-9-

a mother might scold a child and treating her unfairly. At the end of the meeting, Calero asked, with heavy sarcasm, "Is that all Vivian? Can I leave now?" Later, when Reyes approached Calero's desk and asked her why she had again failed to copy her on an e-mail as requested, Calero became furious and told Reyes to stop scolding her, that she was not a child and Reyes was not her mother. Bizarrely, Calero began calling Reyes "mother" and "mommy," refused to provide Reyes an explanation of why she did not copy Reyes on e-mail messages as Reyes had instructed, and repeated, "Don't punish me, stop punishing me." Again, this strange and confrontational behavior was observed by other INS employees.

Not surprisingly, Reyes reported Calero's conduct to Penca. Her memo summarized the May 7th incident and recommended that disciplinary action be taken against Calero. Reyes indicated that Calero was a "disruptive element" and recommended that Calero either be dismissed or transferred out of the San Juan District office.

On May 11, 1998, Calero mailed Penca a copy of her EEO complaint, and informed him that she had been getting counseling from the EEO office of the INS and that she was submitting the complaint to her EEO counselor. Penca subsequently forwarded a copy of the complaint to Reyes.

On May 22, 1998, Calero went on her scheduled two-week annual leave, returning to work on June 2, 1998. Before she left

Calero failed to prepare her cases properly, as Reyes had instructed.

On May 26, 1998, Reyes sent a memorandum to Penca detailing Calero's failure to review her files, as requested. Reyes noted that, in order to prepare the cases with hearings scheduled during the two weeks Calero was out, she and another OGC attorney had been required to work ten hours of overtime.

On June 22, 1998, Penca sent Calero a Notice of Proposed Ten Day Suspension ("Notice"). The two grounds for this suspension were: (1) Calero's disrespectful behavior toward Reyes on May 7, 1998, and (2) Calero's disregard of Reyes' instruction to prepare her cases before going on leave. Calero submitted a 35-page reply in opposition to this Notice.

On July 23, 1998, Calero received her performance appraisal for July 1, 1997, through June 30, 1998. Calero received a "minimally satisfactory" rating in the category of "Advocates for/Represents the Agency" but was given ratings of "fully successful" in categories of "Provides Legal Advice" and "Conducts Legal Research and Writing." Her formal rating, overall, was "fully successful."

Despite these rather positive ratings, Calero received several negative comments in her review. For example, the review noted that Calero failed to prepare several of her cases for hearings, that she failed to inform her supervisor of the status of

her cases and that she required substantial supervision. Despite her titularly satisfactory ratings, Calero viewed this as the first negative review that she had received during her employment with the INS.

On June 24, 1998, Dr. Alonso again recommended that Calero take a few days off from work to rest, and Calero did so.

Despite the rest, it was clear by the middle of the summer that Calero's depression was infecting her relations with persons other than her supervisor. In a memo dated August 12, 1998, Reyes noted Calero's excessive and unwarranted criticism of other attorneys, evident in the e-mails she was sending to lawyers outside the office.

On August 17, 1998, at Dr. Alonso's recommendation, Calero was "partially" hospitalized for ten days due to her depression.[2] In addition, side effects from the antidepressant medication were troubling Calero to the extent that Dr. Alonso changed her prescription.

Following her partial hospitalization, on September 1, 1998, Calero sent an e-mail entitled "transfer on detail" to Paul Virtue, General Counsel, INS ("Virtue"), with a copy to David Dixon, Deputy General Counsel, INS ("Dixon"). Calero informed Virtue and Dixon that she had been suffering from major depression since April

---

[2] The record does not indicate what is meant by "partial" hospitalization.

13, 1998, and that she was being discriminated against and harassed by her supervisors, Reyes and Penca. She noted, among other things, INS' duty to consider a reasonable accommodation that would allow her to perform her job. As her own suggestion for an accommodation, she requested a temporary assignment (a so called "detail") out of her current work site, to the INS office at the San Juan International Airport.

The September 1, 1998, e-mail was the first of what would be many explicit requests for some sort of an accommodation, or at least a dialogue concerning accommodation, to permit plaintiff to continue working while she received treatment for her major depression. The specific accommodation proposed by Calero – temporary assignment to the San Juan airport – may perhaps have presented certain practical problems for the INS. The record is not clear on this point, and, again, the appellees' failure to offer any discussion on the issue has handcuffed the court. It is clear, however, that Calero's employer made no effort to offer any realistic alternative accommodation, or even to discuss the difficulties that plaintiff's major depression was creating for her at work.

On September 4, 1998, Calero once again sent an e-mail notification to Virtue, with a copy to Dixon, to the effect that the lack of any response by the INS to her complaints was causing a deterioration of her physical and emotional health, and that she was

requesting an alternative assignment as a reasonable accommodation for her disability of depression.

On September 8, 1998, a simmering problem related to Calero's apparent tape recording in the office boiled over. In June of 1998, some co-workers of Calero's had told Reyes that they thought that Calero was taping their conversations. In response, Reyes sent out an e-mail reminding all staff that surreptitious tape recording of conversations was impermissible, against INS policy, and could result in discipline. On September 8th, a staff member told Reyes that she observed Calero using a tape recorder while talking with Reyes. Reyes approached Calero, obtained the recorder after some argument and found that, indeed, the tape contained a recording of her conversation. When Reyes told Calero she was going to take the tape, Calero screamed at her and tried to block the doorway. After she managed to make her exit, Reyes turned the tape over to the local FBI office.

Some months later, in a letter to Penca, dated January 20, 1999, Calero claimed that someone in the office had been attempting to tape her conversations without her knowledge in order to "frame" her. She asserted that she taped Reyes inadvertently, unaware that the tape recorder was turned on.

On September 14, 1998, after the screaming incident over the tape recorder, Dr. Alonso recommended that Calero take a medical leave from work for two weeks.

On October 7, 1998, Dixon suspended Calero for five days for disrespectful behavior toward her supervisor and for failure to follow orders. Dixon based his decision on Penca's Notice of Proposed Action issued on June 22, 1998, Calero's response, and Reyes' memorandum of admonishment of March 18, 1998.

Later in October, Calero e-mailed Virtue a third time and again requested a temporary assignment to the INS Airport office in San Juan. Once more, she received no response.

On October 30, 1998, when a new attorney was being hired in the office, Reyes contacted Calero and gave her the choice of either accepting replacement furniture for her office and keeping her office, or keeping her newer furniture and turning her office over to the new attorney. Calero chose to keep her newer furniture and was moved to a less desirable work area, described by Calero as a "grot."

On November 2, 1998, Dr. Alonso observed, in a handwritten note on a prescription pad, that Calero should be transferred to a different workplace in Puerto Rico so that "she could benefit from continued treatment, decreased stressful situations and family support." It is not clear whether this notation reached the defendants.

The following day, Calero faxed Virtue her fourth request for an accommodation. She detailed the medical treatment she was receiving, described the discrimination and harassment she perceived

herself as suffering and emphasized her concern that her depression was affecting her job performance. Significantly, Calero disclosed to Virtue that her problems went beyond her relationship with Reyes:

> Due to the depression, I have detached myself from my family and friends, who have been very worry [sic] about me and had been reaching me and giving me support. My social life had been extremely limited.

In this November 3, 1998, letter, Calero again asked for a transfer to the San Juan International Airport office. Again, the INS made no response.

On November 9, 1998, Dr. Alonso made another recommendation that Calero absent herself from work in order to rest for the remainder of the week. Three days later, Calero made yet another request to be transferred to the San Juan International Airport office in a letter to Virtue. At the end of that month, Dr. Alonso recommended Calero rest from work for ten days starting November 27, 1998.

On December 9, 1998, Reyes issued a Notice of a Proposal of Suspension of Calero for fourteen days for (1) failure to follow orders by surreptitiously tape-recording conversations in the office on September 8, 1998; (2) failure to follow orders by refusing to update Reyes on a particular case; and (3) failure to be forthright with a supervisor by taping conversations in the office and then denying doing so.

On December 15, 1998, Michael Coaster, a Division Chief with the INS' Office of the General Counsel ("Coaster"), denied Calero's requests for an accommodation. His letter stated:

> You wrote that you are depressed because "of the discrimination and harassment based on sex and national origin that (you) have endured within the INS San Juan District Office." This is not a disability as defined by the Rehabilitation Act of 1973 and the Age Discrimination in Employment Act. As such, the agency is not under an obligation to provide you with an accommodation.

This letter made no mention of the medical evidence submitted by Calero confirming her major depression. The Coaster letter did indicate that the INS had at some unspecified time offered to consider reassigning Calero to an existing vacant position outside Puerto Rico, but that Calero had rejected this offer because she did not want to leave Puerto Rico. Except for this reference in the Coaster letter, no documentation exists in the record memorializing this supposed offer to transfer Calero. No details specify the location or nature of the new position, the timing of the supposed transfer, or the identity and authority of the person making the offer.

On February 4, 1999, Calero filed her second EEO complaint alleging discrimination based on gender, national origin, age, mental and physical disability, and retaliation.

On February 16, 1999, Penca found the second ground of Reyes' Proposed Suspension of December to be supported by a

-17-

preponderance of the evidence.  Penca determined that disciplinary action for Calero's failure to follow orders in reporting to Reyes the status of a case was warranted and imposed a ten day suspension without pay on February 16, 1999.  In response, Calero filed several complaints with law enforcement agencies calling for an investigation of the supposed illegal tape-recording of her conversations by coworkers.

On April 6, 1999, Reyes reminded Calero that she was late for an appearance before an immigration judge.  In response Calero falsely denied that she was late. It later emerged that the judge had been kept waiting because of Calero's tardiness.

In early May 1999, Calero was involved in yet another unseemly office incident.  Calero told a student-employee, Lenga Siberon ("Siberon"), to be on guard for "illegal things" that Reyes might ask her to do.  Siberon replied that she was not doing anything illegal.  In a written statement provided to Reyes, Siberon reported that she felt "intimidated and somewhat threatened" by Calero.

On June 4, 1999, a second disturbing incident involving Calero and a different student-employee occurred.  The student, Carmen Ortiz ("Ortiz"), did not interrupt a meeting to give Calero two telephone messages from Calero's son.  Calero exploded at Ortiz for not giving her the messages immediately, screaming at the young woman and berating her.

-18-

On June 11, 1999, Calero's counsel, Miriam Ramos Grateroles, faxed a letter to Doris Meissner, the Commissioner of the INS. Calero's counsel requested that Calero be given a reasonable accommodation in accordance with the Rehabilitation Act and that she be transferred to the Airport office. She also wrote that the conduct and behavior of Reyes was the principal factor underlying Calero's major depression and that some separation from Reyes and the environment at the San Juan office would allow Calero to continue to work despite her disability. Calero's counsel also included a note from Dr. Alonso, which reported that Calero was having difficulty interacting with family and friends due to her depression. The doctor recommended that any transfer of Calero be within Puerto Rico, so that Calero could receive needed family and community support to the extent possible during her illness.

At work, plaintiff's behavioral manifestations of her severe depression continued. During the spring and summer of 1999, Reyes reported to Penca that Calero was at various times "agitated," "out of control," "impossible to work with," "bizarre," and "a constant source of aggravation." On July 9, 1999, during a discussion of a scheduling conflict, Calero repeatedly stated in a loud voice, in the presence of two other employees, that Reyes was harassing her on a daily basis, and that her absences were due to Reyes' constant humiliation.

The final blow-up between Calero and Reyes occurred four days later. Again, the trigger for the eruption should have been a routine matter. Reyes instructed Calero to leave for court so that she would be on time. In a raised voice, Calero called Reyes a liar and stated that Penca and Reyes had made false accusations against her and fabricated evidence against her. Once again, other employees were in the area and overheard the contentious exchange between the two.

The following day, July 14, 1999, Reyes placed Calero on paid administrative leave, where she remained until her termination the following May.

On January 3, 2000, Bo Cooper, General Counsel of the INS, issued a Notice of Proposed Removal to Calero. The Notice was based on four specific grounds: (1) making statements to a co-worker that advocated the mistrust of a mutual supervisor and resulted in anxiety in the workplace; (2) disruptive behavior; (3) conduct unbecoming a Service attorney; and (4) disrespectful behavior towards a supervisor.

On May 4, 2000, Marc Salans ("Salans"), Assistant Director of the Office of Attorney Personnel Management of the Department of Justice, found Calero's removal warranted and made her termination effective as of May 19, 2000.

### III.  Standard of Review

We review a district court's ruling on cross-motions for summary judgment de novo.  See Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002); Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue.  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  Not every genuine factual conflict, of course, necessitates a trial.  "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared."  Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997) (citation omitted).

On the other hand, to survive summary judgment a plaintiff is not required to rely only on uncontradicted evidence. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 n.3 (1st Cir. 1990). In this case, as noted, the record as a whole presents many inconsistencies, displaying perspectives that favor in some lights the defendants and in others the plaintiff. So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling.

## IV. Discussion

Two issues are in play in this appeal: first, whether on the record a reasonable factfinder might conclude that the defendants violated the Rehabilitation Act by failing to offer Calero a reasonable accommodation for her disability; second, whether a factfinder might reasonably find that the defendants violated Title VII by retaliating against Calero for asserting her rights. We begin with the claim under the Rehabilitation Act.

### A. Discrimination Based on Disability

The ADA and Rehabilitation Act prohibit discrimination against an otherwise qualified individual based on his or her disability. The Rehabilitation Act, the precursor to the ADA, applies to federal agencies, contractors and recipients of federal financial assistance, while the ADA applies to private employers with over 15 employees and state and local governments. Although,

-22-

as noted supra n.1, the ADA does not apply here, the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act.

The federal statutes barring discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a "reasonable accommodation" to a disabled employee. 42 U.S.C. § 12112(b)(5)(A). García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 n.9 (1st Cir. 2000).

To assert a claim for failure to accommodate under the Rehabilitation Act, Calero would have to establish the following: (1) that she suffered from a "disability" within the meaning of the statute; (2) that she was a qualified individual in that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) that, despite her employer's knowledge of her disability, the employer did not offer a reasonable accommodation for the disability. See Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999). We will address each of these three elements separately.[3]

---

[3] Two other elements, sometimes noted, require no discussion. It is undisputed that the defendants are covered by the Rehabilitation Act, and that plaintiff suffered in the terms and conditions of her employment.

-23-

## 1. **Disability**

The ADA defines "disability" as either (a) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2); see also 29 C.F.R. § 1630.2(g). Here, plaintiff contends, under subsection (a), that she actually suffered a mental impairment that limited one or more of her major life activities.

It is well established that the determination of whether a plaintiff has a disability must be made on a case-by-case basis. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002); Sutton v. United Airlines, Inc., 527 U.S. 471, 483 (1999). The analysis leading to this determination requires the court to consider the record in the light of three questions. First, did the plaintiff suffer a physical or mental impairment? Second, did the "life activity" limited by the impairment qualify as "major"? Finally, did the impairment, in fact, substantially limit the plaintiff's identified major life activity? See Bragdon v. Abbott, 524 U.S. 624, 630-31 (1998). The burden is on the plaintiff to establish these three elements. See Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1167 (1st Cir. 2002); Carroll, 294 F.3d at 238. We now take up these three inquiries.

### a. **Did the Plaintiff Suffer a Mental Impairment?**

The answer to the first question, on the facts of this case, is obviously in the affirmative. This circuit has recognized depression as a mental impairment that may constitute, at least in some circumstances, a disability under federal law. See Criado v. IBM Corp., 145 F.3d 437, 442 (1st Cir. 1998). A number of other circuits have also recognized depression as a qualifying mental impairment. See, e.g., Ogborn v. United Food & Commercial Workers Union, Local No. 881, 305 F.3d 763, 767 (7th Cir. 2002) ("Major depression can constitute a disability under the ADA."); Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1088 n.8 (9th Cir. 2001) ("In Oregon, stress and depression can be considered mental impairments. The same is true under the ADA."); Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996), amended in part on reh'g, 102 F.3d 1118, cert. denied, 520 U.S. 1274 (1997) ("Depression has been held to constitute a mental impairment."); Doe v. Region 13 Mental Health-Mental Retardation Comm'n., 704 F.2d 1402, 1408 (5th Cir. 1983) (same).

Moreover, the record in this case provides more than sufficient evidence to permit a factfinder to conclude that the plaintiff, in fact, was suffering from major depression during the relevant period. The record confirms Calero's prior history of depression, her diagnosis of depression by at least two physicians, her antidepressant medication, her numerous required medical leaves

from work, and her partial hospitalization. In sum, as a matter of law and of fact, the record clearly favors the plaintiff on the first of the three pertinent questions. A factfinder could easily determine that she suffered a qualified mental impairment. To determine whether the record would support a finding that plaintiff suffered a disability, we now turn to the next question.

### b. Did the Plaintiff's Mental Impairment Limit a "Major" Life Activity?

Calero has highlighted numerous life activities that she says were limited by her depression: sleeping, eating, learning, concentrating, thinking, working and interacting with others. A "major life activity" is an activity of central importance to people's daily lives. Toyota Motor, 534 U.S. at 197. Many of the activities cited by the plaintiff have been recognized, by this court or others, as "major," including sleeping and eating, Criado, 145 F.3d at 442-43; Lawson v. CSX Transp., Inc., 245 F.3d 916, 923 (7th Cir. 2001), learning, Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 155 (1st Cir. 1998), and thinking and concentrating, Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d. 30, 33 n.4 (1st Cir. 2001). The Supreme Court has assumed, without deciding, that working itself may be considered a major life activity for purposes of the ADA. Sutton, 527 U.S. at 492. Likewise, this court has on occasion assumed arguendo that working might be deemed a major life activity under the Rehabilitation Act. See, e.g., Bailey, 306 F.3d at 1168 n.5; Carroll, 294 F.3d at 239;

-26-

Gelabert-Ladenheim v. American Airlines, Inc., 252 F.3d 54, 58 (1st Cir. 2001).

In granting summary judgment for the defendant, the district court did not take issue with plaintiff's claim that her disability interfered with one or more of these recognized major life activities. Moreover, as noted, the appellees' brief has offered us not a word of discussion on the issue. In view of the documented severity of plaintiff's disability, we assume that the defendants concede, at least for purposes of summary judgment, that it interfered with one or more of the major life activities specified by Calero.

c. **Was the Major Life Activity "Substantially" Limited?**

It is a simple matter to find sufficient evidence in the record that Calero's mental impairment did "substantially" limit a major life activity. Although the federal statutes do not explicitly define the phrase "substantially limits," in Sutton the Supreme Court instructed that the phrase "suggests 'considerable' or 'specified to a large degree.'" Sutton, 527 U.S. at 491. Even so, "while substantial limitations should be considerable, they also should not be equated with 'utter inabilities.'" Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999). The Supreme Court has stated that "[w]hen significant limitations result from an impairment, the disability definition is met even if the difficulties are not unsurmountable." Bragdon, 524 U.S. at 641.

An impairment can substantially limit a major life activity, even though the plaintiff is still able to engage in the activity to some extent. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 22 (1st Cir. 2002).

As before, neither the district court nor the appellees here have contested Calero's assertion that her major depression substantially limited one or more of her recognized major life activities. Given this, we must conclude by default that the evidence was sufficient to satisfy the first element of Calero's Rehabilitation Act claim; she did suffer a "disability." The next question is whether she was a "qualified individual." Was she able to perform the essential functions of her job, with or without an accommodation?

### 2. **Qualified Individual**

To be a "qualified individual" under the Rehabilitation Act, a plaintiff must show first that she possesses the requisite skill, experience, education and other job-related requirements for the position and, second, that she is able to perform the essential functions of the position with or without a reasonable accommodation. García-Ayala, 212 F.3d at 646.

An "essential function" is a fundamental job duty associated with a particular position; this function can extend beyond "'an employee's technical skills and experience, even including such individual or idiosyncratic characteristics as

-28-

scheduling flexibility.'"  Ward, 209 F.3d at 34 (quoting Laurin v. Providence Hosp., 150 F.3d 52, 59 n.6 (1st Cir. 1998)).

In this case, the evidence shows that Calero was an experienced trial attorney.  She practiced law for over twenty years and had two successful years of prior experience in this same position in the INS' New York Office.  She received above average to excellent performance reviews through June 30, 1998.  Based on this, a factfinder might easily find that she possessed the requisite skill and experience for the position of Assistant District Counsel.

A much closer question is whether a reasonable factfinder could conclude that Calero, while suffering the powerful effects of her disability, still possessed the ability to function competently and productively in the workplace, either without any modification of her work situation or with a reasonable accommodation.  After all, an employee who is unable to control her bizarre and disruptive behavior may be unfit for employment, no matter how advanced her objective skills or how extensive her experience.  Although appellees' brief ignores the issue entirely, the district court anchored its summary judgment ruling, in part, on its conclusion that the record indisputably confirmed plaintiff's inability to perform her job at an acceptable level.

A plaintiff offering a claim under the Rehabilitation Act confronts a potential "Catch-22" when arguing that she is a

qualified individual under the Act.  She must show both that her impairment substantially limits a major life activity and that she is "otherwise qualified" for her job, meaning she is able to perform the essential functions her position requires, or would be if reasonably accommodated.  In shorthand, the law requires the individual to be both substantially limited and reasonably functional.  Several authors have discussed this quandary.  E.g., Jonathan Brown, Defining Disability in 2001: A Lower Court Odyssey, 23 WHITTIER L. REV. 335, 381-85 (2001); Chai R. Feldblum, Definition of Disability under Federal Anti-Discrimination Law: What Happened? Why? And What Can We Do About It?; 21 BERKELEY J. EMP. & LAB. L. 91, 160-61 (2000); Randal I. Goldstein, Note, Mental Illness in the Workplace after Sutton v. United Airlines, 86 CORNELL L. REV. 927, 944 (2001).

This court need not explore the nuances of this interesting conundrum, since the record in this case is adequate to generate an issue for consideration by a factfinder regarding plaintiff's capacity to perform her job, even while suffering her major depression, with or without an accommodation. The defendants' own evaluation, issued less than a year before plaintiff ceased working for the INS and several months after Calero's attack of depression, gave Calero a job rating, not merely of average, but of "fully successful."  In other words, despite some flaws and problems, the INS pronounced itself fully satisfied with Calero's

level of performance even while she suffered from her major depression. Contrary facts produced at a trial may very well put in play the question of Calero's capacity to perform, but this documentation alone entitles the plaintiff to consideration by a factfinder of the second element of her claim.

To satisfy the third and final element of her Rehabilitation Act claim, plaintiff must prove that her employer, having knowledge of her disability, failed to offer her a reasonable accommodation.

### 3. Reasonable Accommodation

If an employer, aware of an employee's disability, refuses to provide a requested reasonable accommodation, the employer violates the Rehabilitation Act, unless it can show that the proposed accommodation would pose an undue hardship for its business. See Higgins, 194 F.3d at 264.

Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). A careful, individualized review of an accommodation request in light of the specific facts of the case is needed to determine whether the request was reasonable. García-Ayala, 212 F.3d at 647.

To show that a proposed accommodation was reasonable, a plaintiff must prove "not only that the proposed accommodation would

enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001). The request for accommodation must be "'sufficiently direct and specific,' giving notice that she needs a 'special accommodation.'" Id. at 261 (quoting Wynne v. Tufts Univ., 976 F.2d 791, 795 (1st Cir. 1992)).

If the plaintiff offers proof that a sufficiently specific request was made, the defendant may attempt to prove that, in fact, the proposed accommodation was not feasible and would constitute an "undue" hardship. Id. An adequately supported denial of an accommodation request requires the employer "to produce at least some modicum of evidence showing that the [requested accommodation] would be a hardship, financial or otherwise." Ward, 209 F.3d at 37.

In some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation. Reed, 244 F.3d at 262 n.11. The ADA's regulations state that "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual." 29 C.F.R. § 1630.2(o)(1)(iii). The scope of the employer's obligation in this process is not crystal clear, but "[t]he employer has at least some responsibility in determining the necessary accommodation," since "the regulations envision an

-32-

interactive process that requires participation by both parties." 29 C.F.R. § 1630.2(o) (3).

As this court has noted, this interactive process "requires a great deal of communication between the employee and employer." García-Ayala, 212 F.3d at 648 n.12, citing Criado, 145 F.3d at 444. An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute. See Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996) ("There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide a reasonable accommodation that amounts to a violation of the ADA.").

Other circuits have also found that both the employee and a responsible representative of the employer have a duty to participate in this process. See, e.g., Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997) ("We agree that both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith."); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."); Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)

("[O]nce an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. Thus, it is the employee's initial request for accommodation which triggers the employer's obligation to participate in the interactive process of determining one.").

Viewing the facts of this case in the light of these principles, and faced yet again with an utter lack of argument on this point by appellees' counsel, the court must conclude that the evidence regarding reasonable accommodation, while conflicting, is sufficient to generate an issue for a factfinder when viewed in the light most favorable to the plaintiff. First, Calero requested an accommodation on at least six occasions, specifically identifying a transfer as an acceptable form of accommodation. Second, Calero's supervisor, Reyes - usually her adversary - seconded Calero's request by suggesting the transfer herself. Third, on the record as it stands, a factfinder could find that Calero's suggestion of a transfer to a work site at the San Juan airport was "at least on the face of things" feasible. Fourth, a factfinder could also find that the defendants failed to offer a sufficient "modicum of evidence" showing that the accommodation proposed by plaintiff would constitute a hardship.[4] Fifth, even if the proposed accommodation

---

[4] At oral argument, appellees' counsel dismissed the notion of a transfer to the INS office at the San Juan airport, characterizing it as, essentially, unworkable and unprecedented. The record of the case, however, offers no concrete evidence of any justification offered by the defendants to support their rejection

might in some way have been less than ideal from defendants' viewpoint – for reasons not articulated anywhere in the record – a factfinder could well find that the defendants failed to engage in any good faith interactive process to explore whether some variant of the plaintiff's proposal might have been workable.  Indeed, a factfinder might well conclude that, in the face of plaintiff's increasingly desperate requests for an accommodation, the defendants simply stonewalled – going so far as to deny, in the face of substantial medical evidence, that plaintiff suffered a disability at all.  Finally, to the extent that the record hints that the defendants, at some unspecified point and in some unspecified way, offered a transfer out of Puerto Rico as an accommodation (and the record supplies only a wisp of indirect evidence on this point), a factfinder could well conclude that the offer was either grossly inappropriate, given plaintiff's medical condition, or lacking in good faith.

In sum, the record offers sufficient evidence from which a factfinder could conclude that the defendants, being aware of plaintiff's disability and of her request for accommodation, failed to make a reasonable response.  Given that the record contains evidence that, if believed by a factfinder, might have proved (1) that Calero did suffer from a disability within the meaning of the statute, (2) that she was a qualified individual who was able to

of the requested accommodation.

perform the functions of her job, and (3) that her employer failed to reasonably accommodate her disability, plaintiff was entitled to present her Rehabilitation Act claim to a factfinder.

### B. **Title VII Retaliation Claim**

To prove a claim of retaliation, a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. See Gu v. Boston Police Dep't., 312 F.3d 6, 14 (1st Cir. 2002).

The district court held that Calero did prove the first two elements of her retaliation claim. She did engage in protected activity by filing her two complaints with the INS' EEO office, and she was subjected to adverse employment actions. However, the court held that the evidence was insufficient, even viewed in the light most favorable to the plaintiff, to prove a causal connection between the protected activity and the adverse employment actions.

Calero relies primarily on the timing of the employment actions as her primary evidence of causal connection. The Supreme Court has stated that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v.

-36-

<u>Breeden</u>, 532 U.S. 268, 273-74 (2001) (citation omitted). Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity. <u>See</u> <u>Richmond</u> v. <u>ONEOK, Inc.</u>, 120 F.3d 205, 209 (10th Cir. 1997); <u>Hughes</u> v. <u>Derwinski</u>, 967 F.2d 1169, 1174-75 (7th Cir. 1992). We have held that "a showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." <u>Oliver</u> v. <u>Digital Equip. Corp.</u>, 846 F.2d 103, 110 (1st Cir. 1988).

The facts demonstrate sufficient temporal proximity between the protected conduct and the employment action in this case to make out a prima facie case. On March 18, 1998, Calero received the memorandum of admonishment, the first adverse employment action. On April 21, 1998, Calero first contacted the EEO Office. On May 11, 1998, Calero filed her first EEO complaint. Calero sent Penca a copy of this complaint, and Penca in turn, forwarded the complaint to Reyes. We have noted that the prima facie burden in this context is not an onerous one. <u>Fennell</u> v. <u>First Step Designs, Ltd.</u>, 83 F.3d 526, 535-36 (1st Cir. 1996). As plaintiff received her first proposed suspension on June 22, 1998, roughly a month after she made defendants aware that she filed her EEO complaint, we find plaintiff has met her burden of making out a prima facie case of retaliation.

Once the plaintiff has made a prima facie showing of

retaliation, the McDonnell Douglas burden-shifting approach is employed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). We have noted the manner in which courts should consider the McDonnell Douglas analysis in the context of summary judgment: "[O]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." Fennell, 83 F.3d at 535.

Defendants have, in fact, identified numerous clear, specific reasons for the adverse employment actions taken against Calero having nothing to do with any impulse to retaliate against her for protected conduct. The troubling history of plaintiff's insubordinate and disruptive behavior and the occasions when she failed to perform her duties in a satisfactory manner all provided legitimate justification for disciplinary action entirely untainted by retaliatory animus. That plaintiff may point to this same evidence in support of her Rehabilitation Act claim does not diminish the significance of these shortcomings as legitimate bases

for discipline.  The analytical matrix is different for the two statutes, and evidence that may assist a plaintiff's case from one vantage may damage it from another.  Since Calero has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up defendants' retaliatory motive, we will affirm the dismissal of her retaliation claim under Title VII.

### V. Conclusion

The precedential value of this decision may be limited, to some extent, by its unusual circumstances:  the confused state of the record, plaintiff's pro se status, and the failure of appellees' counsel to address in any way the central issues raised by the appeal.  In any event, we are unable to say with confidence that no reasonable factfinder, taking the facts from this record as plaintiff might present them, could return a favorable verdict on the Rehabilitation Act claim.  For this reason, we must conclude that the district court's allowance of defendants' motion for summary judgment on this count was in error. We therefore REVERSE AND VACATE the district court's judgment regarding the Rehabilitation Act and REMAND for further proceedings consistent with this opinion.  In all other respects, the judgment of the district court is AFFIRMED.

Costs are assessed against the appellees.