**Supreme Court**

No. 2014-161-Appeal.
(PM 12-4701)

Pedro Reyes          :

v.          :

State of Rhode Island.          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2014-161-Appeal.
(PM 12-4701)
(Concurrence and dissent begins on page 25)

|                        |   |
|------------------------|---|
| Pedro Reyes            | : |
| v.                     | : |
| State of Rhode Island. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  The applicant, Pedro Reyes (Reyes or applicant), appeals from the denial of his postconviction-relief application.[1]  It is Reyes's contention that his 1994 plea of nolo contendere to the offense of maintaining a narcotics nuisance should be vacated because the plea was not knowing, intelligent, and voluntary.  He also argues that the hearing justice erroneously entered judgment for the state on his claims of ineffective assistance of counsel, that the hearing justice failed to consider other arguments, and that the attorney appointed in connection with his application failed to fulfill his assigned role.  This case came before the Supreme Court for oral argument on December 1, 2015, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After carefully considering the written and oral submissions of the parties, we are satisfied that this appeal may be resolved without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1] The record is unclear as to Reyes's full name.  Reyes signed his application with the name Pedro Reyes, but the caption of that document identifies him as Pedro Muriel Reyes. Additionally, during a change-of-plea hearing in 1994, Reyes indicated that his name was "Pedro Jaun [sic] Reyes Muriel."  We simply shall refer to applicant as Reyes.

# I

## Facts and Travel

In October 1993, the Attorney General's Narcotics Strike Force (strike force) was conducting an investigation into heroin trafficking in an area near Central Falls High School. On October 5, 1993, Investigator Carl Barovier (Barovier), a member of the strike force, approached Jose Romero (Romero) to purchase heroin.[2] Romero entered Barovier's vehicle, and the two drove to the vicinity of Central Falls High School. After Barovier parked his vehicle, Romero exited and approached Ismael Cepeda (Cepeda).[3] The two conversed briefly, and then Cepeda entered a brown Datsun vehicle that was driven by another male. The vehicle drove off, returning about ten minutes later. Cepeda exited the vehicle and gave Barovier five bags containing heroin. Barovier relayed his description of the driver of the Datsun to Inspector Edward H. Randall (Randall); Randall showed Barovier a photograph of Reyes, and Barovier identified Reyes as the driver of the Datsun. Reyes was charged, along with Cepeda and Romero, with conspiracy to distribute heroin within three hundred yards of a school (count 1) and distribution of heroin within three hundred yards of a school (count 2).

Reyes was represented with respect to these charges by privately retained counsel (trial counsel). Eventually, the state dismissed count 2 in accordance with Rule 48(a) of the Superior Court Rules of Criminal Procedure in exchange for Reyes's plea of nolo contendere on count 1 to an amended charge of maintaining a narcotics nuisance. The Superior Court file contains two plea forms executed by Reyes, one in English and the other in Spanish. At the change-of-plea hearing on October 4, 1994, no Spanish interpreter was present, but the record does not indicate

---

[2] The facts giving rise to the pertinent offenses with which Reyes was charged have been gleaned from the criminal-information package.

[3] The record is also unclear as to the precise spelling of Cepeda's last name; in some documents it is spelled "Cepeda," and, in others, "Cepada."

that either trial counsel or Reyes requested the assistance of an interpreter. During the plea colloquy, Reyes was able to respond, in English, to the trial justice's questions.[4] Reyes provided his name and date of birth, and he indicated that he wished to change his plea even before trial counsel responded to that question from the trial justice. Reyes stated that he understood that, by pleading nolo contendere, he was forfeiting several constitutional rights, and, when asked whether he had any questions about those rights, he responded that he did not. After the prosecutor provided the facts in support of the amended charge, Reyes accepted those facts as true. The trial justice found that Reyes "does have the capacity to understand the nature and consequences of his plea including but not limited to the waiver of those rights which I have reviewed with him" and that there was a sufficient factual basis for a plea of nolo contendere. He therefore accepted Reyes's plea and sentenced him to a two-year suspended sentence with three years of probation. In consideration of Reyes's plea, the state elected to refrain from presenting Reyes as a violator of a previously imposed probationary sentence.

Time marched on, and Reyes did not reform his behavior. He subsequently was adjudged to be a probation violator and served a period of incarceration as a result. Additionally, in 2002, he was convicted of second-degree murder, discharging a firearm during the commission of a crime of violence that resulted in death, and carrying a pistol without a license. See State v. Reyes, 984 A.2d 606, 609, 612 (R.I. 2009).[5] For those charges, Reyes was sentenced to two consecutive life sentences. Id. The state also sought the imposition of an additional sentence on the ground that Reyes was a habitual offender under G.L. 1956 § 12-19-21. The conviction

---

[4] To distinguish between the different Superior Court justices involved in the relevant proceedings, we refer to the justice who presided over Reyes's 1994 change-of-plea hearing as "the trial justice" and the justice who presided over the hearings on his application as "the hearing justice."

[5] The facts underlying these convictions are set forth in detail in our opinion affirming his conviction, State v. Reyes, 984 A.2d 606, 609-12 (R.I. 2009), and need not be repeated here.

secured by the 1994 nolo contendere plea was one of the predicate offenses that qualified Reyes as a habitual offender. Reyes received a ten-year sentence on the habitual-offender charge, to be served concurrently with his second life sentence.

In September 2012, Reyes filed a pro se application, in which he sought to vacate his 1994 nolo contendere plea.[6] The application set forth several allegations of ineffective assistance by trial counsel, which fell into two general categories: failure to adequately investigate the case and prepare a defense; and failure to communicate with Reyes through an interpreter so that Reyes could meaningfully participate in the preparation of his defense, even though, according to Reyes, trial counsel knew that he "barely spoke English." With respect to the failure-to-investigate category, Reyes averred that his codefendants in the proceedings that culminated in his 1994 plea "exonerated [Reyes] at a bail hearing," but trial counsel failed to interview these witnesses. One of the paramount allegations in the second category—lack of communication—was that, because trial counsel failed to engage a translator, he was unable to adequately inform Reyes about the nature and consequences of his plea. In addition to his ineffectiveness claims, Reyes also alleged, citing Boykin v. Alabama, 395 U.S. 238 (1969), that the trial justice erred in accepting his plea because (i) Reyes did not understand the nature of the amended charge, (ii) the trial justice overlooked the exculpatory statements of Reyes's codefendants, and (iii) the lack of factual basis for the plea. In addition to his application, Reyes also filed a motion for appointment of counsel as an indigent applicant under G.L. 1956 § 10-9.1-5.

In accordance with § 10-9.1-5, the hearing justice first referred the matter to the Office of the Public Defender. Because a conflict of interest precluded a member of that office from

_____

[6] Despite the lag time between the 1994 plea and the filing of the application, the state opted not to argue below that the application should be dismissed as untimely under the doctrine of laches.

- 4 -

representing Reyes, an attorney (postconviction counsel) was appointed to represent Reyes in connection with his application. In connection with his investigation, postconviction counsel met with Reyes on four occasions; he did not, however, speak with trial counsel. Postconviction counsel also searched for transcripts or recordings of the allegedly exculpatory bail-hearing testimony that Reyes claimed was given by his codefendants. Postconviction counsel's search revealed that the bail hearing was continued twice with no testimony; the records for the third and final day of the bail hearing revealed that, once again, no witnesses testified and that the defendants had admitted that the state had satisfied its burden of showing that bail was not appropriate. This search led postconviction counsel to conclude that the allegedly exculpatory bail-hearing testimony did not exist. Because postconviction counsel's investigation of Reyes's claims led him to the conclusion that Reyes's postconviction claims lacked merit, he moved to withdraw and filed an accompanying forty-two-page no-merit memorandum explaining the reasons behind that conclusion, in accordance with the procedure outlined by this Court in Shatney v. State, 755 A.2d 130 (R.I. 2000).[7]

---

[7] "In Shatney [v. State, 755 A.2d 130 (R.I. 2000)], [this Court] established a procedure by which an attorney * * * who has been appointed to represent an applicant for postconviction relief may later seek to withdraw from that representation under specific and limited circumstances[.]" Campbell v. State, 56 A.3d 448, 455 (R.I. 2012). Specifically, we provided that:

"[U]pon notice to the applicant, counsel for an applicant may request permission from the court to withdraw, based upon an assessment that the application has no arguable merit. To do so, however, [postconviction] counsel must file with the court and serve upon the applicant a motion to withdraw accompanied by a 'no-merit' memorandum that details the nature and extent of his or her review of the case, lists each issue the applicant wished to raise, and explains why in counsel's professional opinion those issues and any others that he or she may have investigated lacked merit. The court then must conduct a hearing with the applicant present. If, based upon its review of counsel's assessment of the potential grounds for seeking post-conviction relief and of any other issues that the applicant wishes to raise, the court agrees that those grounds appear to lack any arguable merit, then it shall permit counsel to withdraw and advise the

During the hearing on postconviction counsel's motion to withdraw, Reyes stated that he had read the no-merit memorandum and had no difficulty understanding its contents. Reyes acknowledged that the memorandum discussed all of the issues that he sought to raise in his application.[8] When Reyes cryptically alluded to a letter from postconviction counsel to Reyes that, according to Reyes, indicated that postconviction counsel represented the state and not Reyes, the hearing justice properly assured Reyes that postconviction counsel was his attorney. Reyes objected to the motion to withdraw on the grounds that postconviction counsel failed to hire an interpreter or an investigator and that he failed to interview trial counsel in connection with his investigation. Postconviction counsel responded that he did not deem an interview with trial counsel to be necessary or appropriate based on his conclusion that Reyes knowingly and voluntarily entered into his plea in 1994. Postconviction counsel also explained that he did not think that an interpreter was necessary during his meetings with Reyes because Reyes had taken English classes while incarcerated and his proficiency with the English language allowed

applicant that he or she shall be required to proceed pro se, if he or she chooses to pursue the application." Shatney, 755 A.2d at 135.

[8] Postconviction counsel identified twelve claims, many of which overlapped one another, that Reyes raised in his application: (1) ineffective assistance of counsel in failing to adequately prepare for representation of Reyes; (2) ineffective assistance of counsel in failing to research and interview the important state witnesses; (3) ineffective assistance of counsel in trial counsel's failure to meet with Reyes and to communicate with him through an interpreter; (4) ineffective assistance of counsel in failing to file appropriate pretrial motions; (5) Reyes's plea was "tainted and coerced" by the illegal and improper actions of the strike force; (6) ineffective assistance of counsel in allowing Reyes to plead nolo contendere without the assistance of an interpreter; (7) ineffective assistance of counsel in trial counsel's failure to discuss the law governing the crimes with which Reyes was charged; (8) ineffective assistance of counsel in failing to advise Reyes as to the legal consequences of a plea of nolo contendere; (9) ineffective assistance of counsel in allowing Reyes to enter his plea when trial counsel knew, or reasonably should have known, that exculpatory evidence existed that, at the very least, cast reasonable doubt on Reyes's guilt; (10) the photo identification in which Reyes was identified as the driver of the automobile was unconstitutional; (11) the trial justice should not have accepted his plea in 1994 because it was unclear whether Reyes understood the consequences of entering into the plea; and (12) the trial justice failed to review the case to determine whether Reyes was guilty of the charged offenses.

adequate communication between them. Postconviction counsel professed to having "absolutely no problems communicating with [Reyes] at all."

The hearing justice granted the motion to withdraw and explained to Reyes that he could still proceed pro se on his application or retain another attorney at his own expense. Additionally, she gave Reyes approximately six weeks to submit a memorandum outlining why he was entitled to postconviction relief. She also notified him, in accordance with § 10-9.1-6, that she was inclined to dismiss his application on the merits unless he came forward with "something of great significance * * * that persuades the [c]ourt that [he] would have gone to trial" on the 1994 charges. During the hearing, Reyes filed a pro se motion for funds to hire a private investigator to track down his codefendants from the 1994 case. The hearing justice denied the motion, concluding that the private investigator's efforts would reach the same conclusion that postconviction counsel had reached after his search for the bail-hearing testimony.

At the next hearing, Reyes provided a witness statement from Cepeda (Cepeda statement), one of his codefendants in the 1994 case.[9] In that statement, which was taken over the telephone by a private investigator, Cepeda explained that he gave testimony to the effect that he never distributed drugs with Reyes. The hearing justice continued the matter to give the state adequate time to review the Cepeda statement and to decide how to proceed.

At the hearing justice's behest, the state filed a motion for summary dismissal. At the hearing on the motion for summary dismissal, the hearing justice gave Reyes an opportunity to be heard. Reyes responded as follows: "I don't have anything to say right now. Everything that I wanted to say, I put in the memorandum." This memorandum mentioned only two documents

---

[9] See Appendix A.

in support of it: the Cepeda statement and a notice of the state's intent to pursue a habitual offender sentence. The hearing justice determined that there were no genuine issues of material fact as to any of the claims raised in the application and granted the state's motion. First, with respect to the allegations of ineffective assistance of counsel, the hearing justice reasoned that, because Reyes ultimately received a "less-than-jail sentence on an amended charge" and was not presented as a probation violator as a result of the plea agreement, Reyes was unable to satisfy the prejudice prong of the ineffectiveness inquiry. In addition to noting this favorable plea disposition, she observed that the Cepeda statement was neither an original document nor executed by Cepeda under the penalty of perjury and that, in any event, it was directed at the offenses with which Reyes was originally charged. The hearing justice therefore concluded that the statement "ha[d] no bearing on the amended charge to which [Reyes] pled."

With respect to Reyes's challenge to the adequacy of the 1994 plea colloquy, the hearing justice, while acknowledging the presence of the Spanish plea form, found no fault in the trial justice's colloquy. She noted that there was no evidence in the plea-colloquy transcript that indicated that Reyes had difficulty understanding the trial justice's questions; there was no indication that Reyes needed to speak with trial counsel during the colloquy; no request for an interpreter was made; and Reyes responded in the affirmative on numerous occasions when asked by the trial justice whether he understood a particular consequence of his guilty plea. The hearing justice rejected Reyes's argument that either the trial justice or trial counsel was required to inform Reyes about any collateral consequence that might arise from his plea or that it might form the basis of a habitual-offender sentencing enhancement in the event that Reyes continued down the criminal path. Ultimately, the hearing justice concluded that Reyes understood the nature and consequences of his plea and that the plea was voluntary. Accordingly, the hearing

justice granted the state's motion for summary judgment and dismissed the application under § 10-9.1-6.  Reyes timely appealed.[10]

## II

### Standard of Review for Summary Dismissal

Before turning to the merits of Reyes's arguments on appeal, we first set forth the parameters under which an application can be summarily dismissed under § 10-9.1-6—the procedure utilized by the hearing justice in this case.  Section 10-9.1-6 provides, in pertinent part, as follows:

> "(b) When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post conviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing.  The applicant shall be given an opportunity to reply to the proposed dismissal.  In light of the reply, or on default thereof, the court may order the application dismissed or grant leave to file an amended application or direct that the proceedings otherwise continue.  Disposition on the pleadings and record is not proper if there exists a genuine issue of material fact.

> "(c) The court may grant a motion by either party for summary disposition of the application when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."

Dismissal under § 10-9.1-6(b) is akin to a dismissal under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure and is subject to the same standard.  Palmigiano v. State, 120 R.I. 402, 404-05, 387 A.2d 1382, 1384 (1978).  In contrast, summary dismissal under § 10-9.1-6(c)

---

[10] After Reyes appealed but before oral argument in this case, the General Assembly amended § 10-9.1-9 to require a party aggrieved by a final judgment entered in a postconviction-relief proceeding to seek review by filing a petition for writ of certiorari with this Court.  See P.L. 2015, ch. 91, § 1; P.L. 2015, ch. 92, § 1.

"closely resembles" a grant of summary judgment under Rule 56 of the Superior Court Rules of Civil Procedure, Palmigiano, 120 R.I. at 405, 387 A.2d at 1384, and "[t]he standards for granting a § 10-9.1-6(c) [summary dismissal] are identical to those utilized in passing on a summary judgment motion." Palmigiano, 120 R.I. at 406, 387 A.2d at 1385. Critically, summary dismissal is improper if a genuine issue of material fact exists. See § 10-9.1-6(c). Thus, a hearing justice's role in considering whether to dismiss an application summarily under § 10-9.1-6(c) is limited to determining whether genuine issues of material fact exist; the hearing justice cannot resolve those issues or "pass on the weight or credibility of the evidence." Doyle v. State, 122 R.I. 590, 594, 411 A.2d 907, 909 (1980). On appeal from a summary dismissal under § 10-9.1-6, "[w]e will uphold the [hearing] justice's decision only if the record shows that no genuine issue of material fact exists and the state is entitled to summary disposition as a matter of law." Palmigiano, 120 R.I. at 406-07, 387 A.2d at 1385. As in cases in which we review the grant of summary judgment, our review is de novo.[11] See Estrada v. Walker, 743 A.2d 1026, 1028 (R.I. 1999).

### III

### Analysis

### A

### Sufficiency of Rule 11 Inquiry

Reyes first contends that his 1994 nolo contendere plea should be vacated because it did not conform to Rule 11 of the Superior Court Rules of Criminal Procedure and was not a

---

[11] In past cases involving summary dismissal of an application, we have remarked that we defer to the factual findings of a hearing justice in the postconviction-relief context. See, e.g., Miguel v. State, 774 A.2d 19, 21 (R.I. 2001). Although undeniably a correct explication of the manner in which we review the factual findings of a lower tribunal, this standard of review is inapposite in cases where the application is summarily dismissed because no such findings can be made by the hearing justice at this juncture.

knowing, intelligent, and voluntary plea. He argues that the trial justice's brief colloquy at the change-of-plea hearing was insufficient to ensure that he understood the nature of the charge and consequences of his plea and that the trial justice should have exercised his discretion to appoint an interpreter. At oral argument before this Court, Reyes took his contention one step further, arguing that, whenever a Spanish language plea form is utilized, a trial justice must appoint an interpreter even when one is not requested. Neither Rule 11 nor this Court's jurisprudence supports such an absolute rule.

Rule 11 provides in pertinent part:

> "The court * * * shall not accept [a plea of guilty] or a plea of nolo contendere without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. * * * The court shall not enter a judgment upon a plea of guilty or nolo contendere unless it is satisfied that there is a factual basis for the plea."

Rule 11 thus sets forth two prerequisites that must be satisfied at the plea colloquy before a plea of nolo contendere can be accepted: (1) a determination "that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea"; and (2) a finding "that there is a factual basis for the plea." Id. Notably, neither prerequisite imposes the bright-line rule that Reyes champions before this Court.

Similarly, this Court has never declared that a trial justice must appoint an interpreter in every case in which a non-English plea form is utilized. To the contrary, we have held that the trial justice has discretionary authority to appoint an interpreter, see State v. Ibrahim, 862 A.2d 787, 798 (R.I. 2004), and we afford the the trial justice "'large discretion' in the 'selection, appointment, and retention of an interpreter.'" State v. Lopez-Navor, 951 A.2d 508, 513 (R.I.

2008) (quoting State v. Deslovers, 40 R.I. 89, 115, 100 A. 64, 73 (1917)).[12] Absent "clear evidence of prejudice, we will not disturb the trial justice's discretion." Id.

In this case, "it is not readily apparent [from our review of the transcript of Reyes's change-of-plea hearing] that [Reyes] did not have a basic, functional understanding of English." Ibrahim, 862 A.2d at 798. Reyes answered all of the questions posed to him, and there is no indication that he was confused or had difficulty understanding the discourse at any point during the hearing. Reyes contends that the transcript of the change-of-plea colloquy "suggest[s] a lack of actual understanding since his responses [to the trial justice's questions] were all non-descriptive 'Yes' and 'No' answers." We disagree. When the trial justice asked whether Reyes wished to change his plea, Reyes answered affirmatively even before trial counsel was able to do so. Reyes also provided, without any apparent difficulty, his name and date of birth upon request. We glean nothing from the record to suggest that anything occurred at the hearing to put the trial justice on notice to inquire further into whether Reyes required an interpreter. In short, there is nothing in this record that suggests that the trial justice abused his discretion by failing sua sponte to appoint an interpreter.

We are also convinced that the change-of-plea colloquy otherwise satisfied Rule 11 and that Reyes's plea was knowing, intelligent, and voluntary. The trial justice explained to Reyes that he was forfeiting several constitutional rights by entering a plea of nolo contendere, and he ensured that Reyes had no questions about those rights and understood the consequences of his plea. Additionally, the state recited the facts supporting the amended charge, Reyes acknowledged that those facts were true, and the trial justice found that there was a factual basis for the plea. See Rodrigues v. State, 985 A.2d 311, 315 (R.I. 2009) ("This Court 'shall not

---

[12] General Laws 1956 chapter 19 of title 8 is not implicated in this case because Reyes entered his plea before the effective date of that chapter.

- 12 -

vacate a plea unless the record viewed in its totality discloses no facts that could have satisfied the trial justice that a factual basis existed for a defendant's plea.'" (quoting State v. Frazar, 822 A.2d 931, 935-36 (R.I. 2003))). Finally, the trial justice explained to Reyes the sentence that he would be imposing and ensured that Reyes had no questions about the consequences of the suspended sentence and accompanying probationary term. On this record, we must conclude that the trial justice's finding that Reyes understood the nature and consequences of his plea is unassailable.

## B

### Ineffective Assistance of Counsel

Reyes next contends that the hearing justice improperly dismissed his claims of ineffective assistance of counsel because a genuine issue of material fact existed that precluded summary dismissal. Before addressing the propriety of the summary dismissal of his claims, however, we first briefly clarify the legal framework under which such a claim must be decided.

It is well established that, in this jurisdiction, ineffective-assistance-of-counsel claims are assessed under the familiar two-pronged test announced by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984). See Bido v. State, 56 A.3d 104, 110 (R.I. 2012); Brown v. Moran, 534 A.2d 180, 182 (R.I. 1987); Barboza v. State, 484 A.2d 881, 883-84 (R.I. 1984). Under this framework, an applicant for postconviction relief first "must establish that counsel's performance was constitutionally deficient; '[t]his requires [a] showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed * * * by the Sixth Amendment.'" Bido, 56 A.3d at 110-11 (quoting Neufville v. State, 13 A.3d 607, 610 (R.I. 2011)); see also Strickland, 466 U.S. at 687. To satisfy the performance prong, "the [applicant] must show that counsel's representation fell below an objective standard of

- 13 -

reasonableness." Strickland, 466 U.S. at 688. Courts evaluate counsel's performance "in a 'highly deferential' manner," Bido, 56 A.3d at 111 (quoting Lynch v. State, 13 A.3d 603, 606 (R.I. 2011)), employing "a strong presumption that counsel's conduct falls within the permissible range of assistance," id. (quoting Neufville, 13 A.3d at 610). See also Strickland, 466 U.S. at 689.

The second prong of the Strickland standard requires an applicant to "show that he [or she] was prejudiced by this deficient performance." Bido, 56 A.3d at 111 (quoting Lynch, 13 A.3d at 605). To satisfy the prejudice prong, "[t]he [applicant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Bido, 56 A.3d at 111.

In the years since our adoption of Strickland's performance and prejudice prongs, however, a handful of our cases have somewhat amplified that standard. In State v. Dunn, 726 A.2d 1142 (R.I. 1999), we stated, in dictum,[13] that:

> "We note also that rarely, if ever, following conviction has any federal or state court permitted a defendant who has been represented by private counsel to later question, in post-conviction proceedings, the ineffectiveness or inefficiency of the trial counsel that the defendant chose and selected to represent him or her at trial. The 'incompetency (or one of its many synonyms) of private counsel for the defendant in a criminal prosecution is neither a denial of due process under the Fourteenth Amendment, nor an infringement of the right to be represented by counsel under either the federal or state constitution, unless the attorney's representation is so lacking that the trial has become a farce and a mockery of justice, in which case the judgment, violating either the Fifth, Sixth, or Fourteenth Amendment to the Federal Constitution, or a provision of a state constitution, is void.'" Id. at 1146 n.4

---

[13] In State v. Dunn, 726 A.2d 1142, 1145-46 (R.I. 1999), we held that the trial justice clearly erred in granting the defendant's motion for a new trial on the ground of ineffective assistance of counsel—an issue that was not raised by the defendant.

(quoting Annotation, <u>Incompetency of Counsel</u>, 74 A.L.R.2d 1390, 1397 (1960)) (emphasis added).

Although by no means a constant feature of our ineffective-assistance-of-counsel jurisprudence, this farce-and-mockery language has reappeared on several occasions, both in cases where defense counsel evidently was privately retained[14] and in cases where it was unclear whether defense counsel was retained or appointed.[15] In this case, postconviction counsel and the hearing justice referenced this language when assessing Reyes's allegations that trial counsel, who was privately retained, was ineffective. On appeal, Reyes argues that this language "is not part of the Sixth Amendment effective[-]assistance[-]of[-]counsel jurisprudence."

We take this opportunity to abandon any distinction in our ineffective-assistance-of-counsel jurisprudence between privately retained defense counsel and court-appointed defense counsel. In <u>Evitts v. Lucey</u>, 469 U.S. 387, 395 (1985), the Supreme Court declared that "the constitutional guarantee of effective assistance of counsel at trial applies to every criminal prosecution, without regard to whether counsel is retained or appointed." Similarly, in <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344-45 (1980), the Supreme Court cautioned that:

> "A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. * * * Since the State's conduct of a criminal trial itself implicates the State in the defendant's

---

[14] See, e.g., <u>Brown v. State</u>, 964 A.2d 516, 527 n.15 (R.I. 2009); <u>Chalk v. State</u>, 949 A.2d 395, 398 (R.I. 2008); <u>Burke v. State</u>, 925 A.2d 890, 893 (R.I. 2007); <u>Larngar v. Wall</u>, 918 A.2d 850, 856 & n.6, 858 (R.I. 2007); <u>Hampton v. State</u>, 786 A.2d 375, 381 (R.I. 2001); <u>Vorgvongsa v. State</u>, 785 A.2d 542, 548 (R.I. 2001); <u>Heath v. Vose</u>, 747 A.2d 475, 477 n.1 (R.I. 2000); cf. <u>Hassett v. State</u>, 899 A.2d 430, 434 n.3 (R.I. 2006) (although not employing the farce-and-mockery language, explaining that "challenges to the performance of private counsel in postconviction relief proceedings rarely succeed, and when a person selects his or her own attorney, any alleged deficiencies seldom amount to an infringement of one's constitutional rights").

[15] See, e.g., <u>Pelletier v. State</u>, 966 A.2d 1237, 1241 (R.I. 2009); <u>Moniz v. State</u>, 933 A.2d 691, 696, 697 (R.I. 2007); <u>Ferrell v. Wall</u>, 889 A.2d 177, 191 (R.I. 2005).

- 15 -

conviction, we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."

Additionally, we are of the opinion that the farce-and-mockery language contained in Dunn and its progeny is a relic of a bygone era that has no place in assessing claims of ineffective assistance of counsel after Strickland. The farce-and-mockery standard evidently was first announced in Diggs v. Welsh, 148 F.2d 667, 669, 670 (D.C. Cir. 1945), and, by the time the United States Supreme Court decided Strickland in 1984, every federal circuit had rejected it in favor of a standard requiring reasonably competent or effective assistance. See Trapnell v. United States, 725 F.2d 149, 151-53, 155 (2d Cir. 1983) (chronicling origin of and gradual departure from farce-and-mockery standard and adopting standard of reasonably competent assistance in its place).[16] Nothing the Supreme Court said in Strickland purported to revive the farce-and-mockery standard. Moreover, the farce-and-mockery standard has its roots in the Due Process Clause of the Fifth Amendment to the United States Constitution, see Diggs, 148 F.2d at 669; see also Trapnell, 725 F.2d at 154, while claims of ineffective assistance of counsel are grounded in the guarantee of the assistance of counsel contained in the Sixth Amendment to the United States Constitution, see Strickland, 466 U.S. at 684-86, and its Rhode Island counterpart, the Declaration of Rights, article 1, section 10 of the Rhode Island Constitution, see Merida v. State, 93 A.3d 545, 549 (R.I. 2014). Henceforth, claims of ineffective assistance of counsel— whether the attorney is privately retained or court appointed—shall continue to be decided by reference to the familiar performance and prejudice prongs of the Strickland standard.[17]

---

[16] We also note that the annotation from which we quoted the farce-and-mockery language in Dunn, 726 A.2d at 1146 n.4, similarly predated Strickland.

[17] We do not imply that the difference in phraseology between the performance and prejudice prongs of Strickland v. Washington, 466 U.S. 668 (1984), and the farce-and-mockery language would necessarily make a difference in the adjudication of an ineffective-assistance-of-counsel

- 16 -

With the governing standard in proper focus, we turn to its application in this case. On appeal, Reyes contends that the Cepeda statement raised a genuine issue of material fact that precluded summary dismissal of his claims of ineffective assistance of counsel. We take no issue, however, with the hearing justice's determination that no genuine issue of material fact existed. While the Cepeda statement may cause some to have doubts about Reyes's involvement in the 1994 incident, the statement is riddled with maladies that barred it from the hearing justice's consideration on summary dismissal. Part and parcel of our summary judgment standard (which the summary dismissal standard so closely mirrors) is that the evidence to be considered when determining whether a genuine issue of material fact exists must be admissible. See Carlson v. Town of South Kingstown, 131 A.3d 705, 708 (R.I. 2016) ("We will affirm a lower court's decision only if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." (emphasis added) (quoting Daniels v. Fluette, 64 A.3d 302, 304 (R.I. 2013))); see also Mruk v. Mortgage Electronic Registration Systems, Inc., 82 A.3d 527, 534 (R.I. 2013) (recognizing that affidavits must be "made on personal knowledge, * * * set forth such facts as would be admissible in evidence, and * * * show affirmatively that the affiant is competent to testify to the matters stated therein[,]" and that the failure to comply with these requirements renders them inadmissible and, thus, "useless in establishing the absence of a genuine issue of material fact" (quoting Nichola v. Fiat Motor Co.,

claim in any particular case; indeed, we suspect that such a difference would exist "only in the rarest case." Strickland, 466 U.S. at 697; see also Trapnell v. United States, 725 F.2d 149, 153 (2d Cir. 1983) ("[W]e have repeatedly applied both standards[—the farce-and-mockery standard and the standard of reasonably competent assistance—]in recent years and never found that the result of a case hinged on the choice of a particular standard."). Our review of the cases in which we have employed the farce-and-mockery language convinces us that none of them fall into this exceedingly narrow category.

463 A.2d 511, 513 (R.I. 1983))); Plainfield Pike Gas & Convenience, LLC v. 1889 Plainfield Pike Realty Corp., 994 A.2d 54, 57 (R.I. 2010) (acknowledging that summary judgment should be affirmed only if no genuine issue of material fact exists based upon a review of the admissible and competent evidence); Nichola, 463 A.2d at 513-14 (noting that statements within an affidavit that "amounted to little more than hearsay" should not be considered by a trial justice in ruling on a summary judgment motion).

Here, the Cepeda statement would not stand the slightest chance of being admissible. First, the witness statement is not presented in the form of an affidavit or other type of sworn testimony, as is made obvious based upon the method of delivery (via telephone). Furthermore, the statement was somehow "notarized" by one Nicholas Cardarelli, with, in place of the witnesses's signature, the words "RECORDED OVER TELEPHONE."[18] In addition, to the extent that the witness statement contains statements delivered to and transcribed by Cardarelli, the statements constitute hearsay. To that end, we have held that, where statements within a sworn affidavit would constitute hearsay, such statements should not be considered in ruling on a summary judgment motion. See Nichola, 463 A.2d at 513-14. Thus, the hearing justice properly concluded that the Cepeda statement did not create a genuine issue of material fact.[19] Aside from a notice of the state's intent to pursue a habitual offender sentence, Reyes produced nothing

---

[18] Although we are not in a position to opine as to whether any of the Standards of Conduct for Notary Publics were violated, we are troubled by the fact that Cardarelli affixed his signature and notary seal to a statement that was not given in person by Cepeda, nor was it signed by Cepeda.

[19] The dissent downplays the defective and untrustworthy nature of the Cepeda statement and suggests that the notary public's "mistake" should not foreclose Reyes's postconviction claim. However, because of the notary's disregard for his duties, it is unclear whether Cepeda was even the person with whom he spoke on the telephone and from whom he received a statement. Contrary to the dissent's insistence, the Cepeda statement was useless for purposes of opposing summary dismissal consistent with the standards underlying Rule 56 of the Superior Court Rules of Civil Procedure.

else in opposition to the state's motion for summary dismissal; the hearing justice properly granted the motion.[20]

**C**

**Postconviction Counsel's Compliance with § 10-9.1-5 and <u>Shatney</u>**

Finally, Reyes contends that the efforts of his postconviction counsel were inadequate. Specifically, he faults postconviction counsel for "simply respond[ing]" to Reyes's postconviction claims instead of "mak[ing] an effort to narrow [the] issues, re[]frame[,] or supplement them," not speaking with trial counsel or reviewing his files, and failing to hire an investigator. We reject these contentions.

"[T]he right to counsel in a postconviction-relief proceeding is a matter of legislative grace, not constitutional right."[21] <u>Campbell v. State</u>, 56 A.3d 448, 454 (R.I. 2012). Section 10-

---

[20] In concluding that the production of the Cepeda statement should have precluded summary disposition, the dissent suggests that we turn both our existing postconviction relief case law and § 10-9.1-6(c) on its head. When a hearing justice grants a motion to withdraw pursuant to <u>Shatney</u>, the applicant has the option of proceeding <u>pro se</u> on his application or retaining another attorney at his own expense. See <u>Shatney</u>, 755 A.2d at 135. Independent of this withdrawal, if the circumstances warrant, the hearing justice "may grant a motion by either party for summary disposition of the application when * * * there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Section 10-9.1-6(c). The applicant is not entitled to any special treatment because—after his postconviction claims were determined to be meritless—he is forced to now proceed <u>pro se</u>. Nevertheless, the dissent suggests the system should bend over backwards for an applicant after withdrawal of postconviction counsel by allowing an applicant to oppose summary dismissal with inadmissible evidence, or, in the alternative, entitling the applicant to a warning and a second shot when he submits inadmissible evidence. This is not only impractical, but also flies in the face of longstanding authority.

[21] Although Reyes cites <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012), in his show-cause statement for an unrelated proposition, he did not argue to the Superior Court and has not argued to this Court on appeal that there is a constitutional right to counsel in this collateral proceeding with respect to his claims of ineffective assistance of counsel. The United States Supreme Court in <u>Martinez</u> noted that it is an open question "whether a prisoner has a [constitutional] right to effective counsel in collateral proceedings [that] provide the first occasion to raise a claim of ineffective assistance at trial," but it did not decide that question in <u>Martinez</u>, <u>id.</u> at 1315, and has not decided it since. Because it is not properly before us in this case, we express no opinion on this issue.

9.1-5 provides that, in cases like this one where the Office of the Public Defender is unable to represent the applicant, "the court shall assign counsel to represent the applicant." As is true in other contexts, "[t]he hallmarks of a meaningful attorney-client relationship * * *, including zealous advocacy and the protection of the [client's] confidences," exist between the applicant and counsel appointed under § 10-9.1-5. Campbell, 56 A.3d at 454-55; see also id. at 455 ("Section 10-9.1-5 cannot be satisfied with anything less than a meaningful attorney-client relationship between appointed counsel and his or her client.").

Of course, relations between attorney and client do not always remain harmonious. In some cases, postconviction applicants insist on pressing claims that are frivolous or mendacious, notwithstanding the risk of sanctions for violating Rule 11 of the Superior Court Rules of Civil Procedure.[22] Attorneys who are appointed to represent a postconviction applicant, on the other hand, cannot ignore the requirements of Rule 11. In recognition of this potential conflict, we adopted a mechanism in Shatney so "that an attorney * * * appointed to represent an indigent applicant may withdraw from that representation when it becomes clear, after a reasonable investigation, that some or all of the applicant's claims lack merit." Campbell, 56 A.3d at 455-56.

Within this framework, Reyes's assignments of error regarding postconviction counsel are unpersuasive. Our decision in Campbell involved the paradigm example of noncompliance with § 10-9.1-5. In that case, despite the applicant's repeated requests for counsel, the hearing justice appointed an attorney to conduct an "independent examination" of whether the

---

[22] Rule 11 of the Superior Court Rules of Civil Procedure, which applies in the postconviction context, see Campbell, 56 A.3d at 455, gives the trial court discretion to impose sanctions where a signed pleading, motion, or other paper is not "well grounded in fact and * * * warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law * * *." Rule 11; see generally FIA Card Services, N.A. v. Pichette, 116 A.3d 770, 778-79 (R.I. 2015).

applicant's claims were meritorious. Campbell, 56 A.3d at 451, 452. The hearing justice repeatedly informed the applicant that the appointed counsel did not represent him. Id. at 452-53. We determined that the appointment of counsel in Campbell failed to comply with the requirements of § 10-9.1-5. Campbell, 56 A.3d at 456, 461-62.

This case is nothing like Campbell. The record is clear that postconviction counsel functioned as Reyes's attorney;[23] he met with Reyes on four separate occasions and expended considerable effort to locate the alleged exculpatory bail-hearing testimony about which, according to Reyes, trial counsel knew or should have known. At the hearing on the motion to withdraw, postconviction counsel represented that he "spent hours" attempting to locate the alleged bail-hearing testimony, and he chronicled his efforts in detail. In denying Reyes's motion for funds to hire a private investigator, the hearing justice explained that "[postconviction counsel] did everything that [he] could do to determine if there was any recording from that hearing." Against this backdrop, Reyes's argument with respect to postconviction counsel's failure to hire an investigator rings hollow. It was permissible for postconviction counsel to take it upon himself to perform the investigative responsibilities that he deemed necessary; he was not required to hire an investigator to undertake duplicative efforts. Cf. Campbell, 56 A.3d at 455-56 ("The procedure set forth in Shatney simply applies Rule 11's proviso to the context of the postconviction remedy, such that an attorney * * * appointed to represent an indigent applicant may withdraw from that representation when it becomes clear, after a reasonable investigation, that some or all of the applicant's claims lack merit." (emphasis added)).

---

[23] Indeed, when Reyes expressed some confusion about whether postconviction counsel represented him or the state, the hearing justice promptly reassured him that postconviction counsel was his attorney.

Reyes's complaint about postconviction counsel's failure to discuss the case with trial counsel or review his files similarly misses the mark. In his no-merit memorandum, postconviction counsel focused on Reyes's inability to establish prejudice because of the favorable disposition that trial counsel secured for his client. Postconviction counsel noted that, in marked contrast to the potential for significant jail time that Reyes faced if convicted on the original charges, trial counsel was able to persuade the state to dismiss one charge, amend the other charge to a lesser offense, agree to a non-incarcerative sentence, and refrain from presenting Reyes as a probation violator. While Reyes was insisting that exculpatory testimony mirroring the allegations in the Cepeda statement was given at his bail hearing, postconviction counsel had expended considerable effort to locate this alleged bail-hearing testimony to no avail, and the hearing justice appropriately concluded that "there was no testimony given under oath exonerating [Reyes in] this matter." Thus, Reyes's claim attacking postconviction counsel's alleged shortcomings is without merit.

Finally, it is significant that, pursuant to Shatney, 755 A.2d at 135, postconviction counsel filed a comprehensive memorandum in which he—as Reyes acknowledged at the hearing on the motion to withdraw—correctly identified each of the many claims asserted in Reyes's application and thoroughly explained the reasons why, in counsel's professional opinion, they lacked merit. On appeal, Reyes complains that postconviction counsel failed to narrow or reframe the claims contained in his application, but appellate counsel similarly makes no effort to articulate how those claims could have been reworked, and an attorney will not always be able to salvage a meritless application from the scrap heap. Cf. Campbell, 56 A.3d at 458 (explaining that "appointed counsel may, in an appropriate case, frame the applicant's claims in such a way as to avoid § 10-9.1-8's waiver rule"). We note that a tension is

unavoidable in cases in which the Shatney procedure is invoked. Our decisions in Campbell and Shatney recognize that, in some cases, appointed counsel's efforts must, at some point, shift from diligent investigation and meaningful representation to dispassionate explanation of why, in the exercise of counsel's professional judgment, the claims lack merit. See Campbell, 56 A.3d at 455-56; Shatney, 755 A.2d at 135. Importantly, this is a case where the paradigm shift properly occurred, whereas Campbell involved a situation where counsel acted as an objective, independent, and dispassionate outsider from the outset.

For these reasons, we conclude that postconviction counsel functioned as Reyes's attorney and, because he deemed Reyes's application to be meritless based on the record that existed at that time, he complied with the procedure outlined in Shatney. See Shatney, 755 A.2d at 135. Similarly, the hearing justice complied with our directive in Shatney that a hearing be held at which Reyes was able to respond to the no-merit memorandum, and, at the conclusion of the hearing, she appropriately granted the motion to withdraw.[24] See id.

Although we affirm the hearing justice's decision to allow postconviction counsel to withdraw, we nonetheless pause to remind the bench and the bar that the Shatney procedure is not the endgame. An attorney is not appointed under § 10-9.1-5 to perform a screening function or to steer the case towards the filing of a no-merit memorandum and then withdraw from the arena. Rather, § 10-9.1-5 directs that an attorney be appointed to represent the applicant in connection with the litigation of his or her application, see Campbell, 56 A.3d at 454-56, 461,

---

[24] The dissent states that it is "compelled to express [its] belief that the time has come to abrogate Shatney, at least as it relates to first-time applicants." As the dissent recognizes, however, "Shatney's life expectancy was not addressed by the parties in this case[,]" and, thus, is not before this Court. We agree that this issue is not before us, and decline to address it further. The hearing justice and postconviction counsel properly followed the Shatney procedure, which was the law at the time of the hearings below and the time the appeal was taken, and which continues to be the law today.

and the <u>Shatney</u> procedure is a judicially created escape hatch to be opened only in those cases where the appointed attorney's obligations under Rule 11 require withdrawal because the only alternative, in counsel's professional opinion, is the impermissible pursuit of irremediably frivolous claims.[25]

**IV**

**Conclusion**

For the reasons articulated above, we affirm the judgment summarily dismissing Reyes's application. The papers may be remanded to the Superior Court.[26]

---

[25] We reiterate that an attorney's reluctance or refusal to accept an appointment "is not embraced by the dictates of <u>Shatney</u> * * *, and the fact that counsel may decline the appointment should not result in the summary dismissal of an applicant's claims absent compliance with § 10-9.1-5." <u>Campbell</u>, 56 A.3d at 456 n.5; <u>see</u> <u>also</u> <u>Shatney</u>, 755 A.2d at 136 ("The appointment of Shatney's first counsel, who then limited her entry of appearance and apparently declined to pursue the application and/or withdrew before pursuing petitioner's claim, before the court allowed her to withdraw, and before the court passed on the alleged lack of merit of such an application, did not fulfill the requirements of § 10-9.1-5 in this case.").

[26] Notwithstanding the state's failure to raise the doctrine of laches before the hearing justice, the state argued in its papers to this Court that review of that issue "is not necessarily foreclosed." At oral argument, however, the state conceded that, because this affirmative defense was not raised below, it has been waived. This concession is well-taken. <u>See</u> <u>Andrukiewicz v. Andrukiewicz</u>, 860 A.2d 235, 241 (R.I. 2004) (holding that the plaintiff failed to preserve defense of laches for appellate review where the plaintiff failed to raise it before the trial justice).

**Justice Goldberg, with whom the Chief Justice joins, concurring in part and dissenting in part.** I join the majority's well-written opinion clarifying this Court's standard of review of a hearing justice's summary dismissal of an applicant's postconviction-relief (PCR) application and its affirmance of the hearing justice's summary dismissal of Reyes's claim that his 1994 nolo contendere plea violated Rule 11 of the Superior Court Rules of Criminal Procedure and was not knowing, intelligent, and voluntary.[1] I also unhesitatingly join the majority's insightful decision to abrogate the farce-and-mockery language of State v. Dunn, 726 A.2d 1142, 1146 n.4 (R.I. 1999), and its progeny and to reiterate that Rhode Island is, henceforth, a strictly Strickland[2] jurisdiction with respect to claims of ineffective assistance of counsel.

I part company with my colleagues, however, on the issue of whether the hearing justice's summary dismissal of Reyes's claims of ineffective assistance of counsel was proper. These claims alleged violations of a fundamental constitutional right. This first PCR application

---

[1] I note that I am not convinced that the trial justice properly concluded that there was a sufficient factual basis for the plea—a requirement of Rule 11 of the Superior Court Rules of Criminal Procedure. However, Reyes's argument on appeal focused exclusively on the trial justice's failure to appoint an interpreter sua sponte. Apart from one sentence in his show-cause statement in which he asserted "there is neither a discussion of Mr. Reyes'[s] role in the amended charge of maintaining a narcotics nuisance, nor of his understanding of that charge," the entirety of his argument on appeal concerns the failure to appoint an interpreter. In my opinion, this single sentence fails to adequately develop—and, therefore, preserve for this Court's review—any argument concerning the lack of factual basis for the plea. See McMahon v. Deutsche Bank National Trust Co., 131 A.3d 175, 176-77 (R.I. 2016) (mem.); see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. * * * '[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.'" (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)).

[2] Strickland v. Washington, 466 U.S. 688 (1984).

was Reyes's one and only chance to assert these claims. The attorney who was appointed to represent Reyes concluded—without conferring with Reyes's trial counsel—that these claims lacked merit. This determination was premature. Reyes was then forced to represent himself and was instructed by the hearing justice to come forward with "something of great significance." He did so. Reyes presented the hearing justice with the Cepeda statement before the state filed its motion for summary dismissal under G.L. 1956 § 10-9.1-6(c). Although the majority claims that the Cepeda statement is "riddled with maladies," all of the supposed "maladies" stem from one aspect of the statement: The registered notary public took the statement over the telephone and notarized it, rather than having Ismael Cepeda (Cepeda) swear to its contents in his presence.[3] The hearing justice considered the Cepeda statement and nonetheless summarily dismissed Reyes's ineffectiveness claims.

In concluding that the hearing justice was "barred" from considering the Cepeda statement, the majority overlooks four critical facts. First, Reyes was forced to proceed pro se after postconviction counsel, who was statutorily required to represent him zealously, jumped ship long before Rule 11 of the Superior Court Rules of Civil Procedure required such a drastic course of action. Second, the Cepeda statement—which the majority analyzes as if it were a document submitted in opposition to a summary-judgment motion—was submitted before the state moved for summary dismissal under § 10-9.1-6(c). Third, the state did not coherently raise any argument that the hearing justice was barred from considering this document at the summary-dismissal stage, nor did the hearing justice hold that she was so constrained. Fourth, the "maladies" of which the majority complains were caused by the actions of the notary and not by Reyes, who remained in prison, stripped of counsel and forced to proceed pro se. In my

---

[3] A copy of the Cepeda statement is appended to this opinion. The notary seal is visible in a copy of the statement in the lower-court file.

opinion, summary dismissal of these claims was improper; an evidentiary hearing, at which Reyes would have been accorded his right to counsel, was required. Therefore, I respectfully dissent and express my concern about the posture the majority has taken in this appeal.

**Timing and Nature of Claims of Ineffective Assistance of Counsel**

In this jurisdiction, a claim of ineffective assistance of counsel ordinarily cannot be addressed by this Court on direct appeal; instead, such claims must be asserted in a PCR application.[4] See State v. Brouillard, 745 A.2d 759, 768 (R.I. 2000). At the same time, the statutory framework governing the PCR context mandates that, in most cases, an applicant will have but one opportunity to press a claim for postconviction relief. Section 10-9.1-8 provides that:

> "All grounds for relief available to an applicant at the time he or she commences a proceeding under this chapter must be raised in his or her original, or a supplemental or amended, application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."

---

[4] A narrow exception to this general rule exists where the claim is based on a "specific, reviewable ruling" by the trial justice. State v. Pineda, 13 A.3d 623, 635 (R.I. 2011). It is the rare case in which this exception applies.

The upshot is that, in this jurisdiction, a criminal defendant has one and only one opportunity to assert a claim for ineffective assistance of counsel, and that opportunity almost always must occur in the PCR context. See Martinez v. Ryan, 132 S. Ct. 1309, 1315 (2012) (explaining that, when claims of ineffective assistance of counsel can be raised only in a collateral proceeding, such as the PCR context in this state, "the initial-review collateral proceeding [is] a prisoner's 'one and only appeal' as to an ineffective-assistance claim").

Compounding matters, a claim alleging ineffective assistance of counsel is of paramount importance. As the United States Supreme Court has explained, "[t]he right to the effective assistance of counsel at trial is a bedrock principle in our justice system" and "the foundation for our adversary system." Martinez, 132 S. Ct. at 1317. For this reason, it is critical that a PCR applicant be afforded a meaningful opportunity to vindicate such a claim. As the Supreme Court has suggested, such an opportunity may require effective assistance of counsel in the PCR context:

> "Without the help of an adequate attorney, a prisoner will have * * * difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim. * * * To present a claim of ineffective assistance at trial in accordance with the [s]tate's procedures, then, a prisoner likely needs an effective attorney." Id.

The majority concludes—correctly, in my opinion—that this case does not present the question of whether the United States Constitution requires that a PCR applicant asserting a claim of ineffective assistance of counsel be afforded effective assistance of counsel in the PCR context. See id. at 1315 (noting this open question). However, Martinez instructs that a claim of

ineffective assistance of counsel cannot be given short shrift merely because it is asserted for the first time in the PCR context and not on direct appeal. To the contrary, the claim must receive serious consideration.[5]

### Postconviction Counsel's Compliance with § 10-9.1-5

The General Assembly has mandated that:

> "An applicant who is indigent shall be entitled to be represented by the public defender. If the public defender is excused from representing the applicant because of a conflict of interest or is otherwise unable to provide representation, the court shall assign counsel to represent the applicant." Section 10-9.1-5.

This unambiguous statutory text contains no exception: A PCR applicant has the unqualified statutory right to appointed counsel who "represent[s] the applicant." Id.

This Court, however, has qualified and cabined a PCR applicant's right to counsel. In Shatney v. State, 755 A.2d 130, 135 (R.I. 2000), this Court "established a procedure by which an attorney * * * who has been appointed to represent an applicant for postconviction relief may

---

[5] During one of the hearings in this case, the following exchange transpired between the hearing justice and Reyes:

> "[THE COURT:] * * * Now, sir, I also have to note that you are doing a life sentence for a separate offense.
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: Why are we going through this exercise?
>
> "THE DEFENDANT: Based on this case, I got a different sentence in the other case, habitual.
>
> "THE COURT: But you're still doing two life sentences."

The length of the sentences that Reyes may have received in other, unrelated cases was, of course, utterly irrelevant to the merits of Reyes's claims of ineffective assistance of counsel. These claimed violations of Reyes's fundamental constitutional right warranted careful consideration.

later seek to withdraw from that representation under specific and limited circumstances." Campbell v. State, 56 A.3d 448, 455 (R.I. 2012). In broad strokes, Shatney allows an applicant's appointed counsel to withdraw after filing a so-called "no-merit" memorandum containing a description of the extent of counsel's review of the case and an explanation of why the issues raised in the application lack merit. Shatney, 755 A.2d at 135. At that point, the hearing justice is obligated to conduct a hearing in the applicant's presence. Id. If the hearing justice agrees that the claims "lack any arguable merit," the motion to withdraw may be granted, and the applicant is advised of the right to proceed pro se. Id. (emphasis added).

As aptly set forth by the majority, the Shatney procedure represents nothing more than "a judicially created escape hatch" available only when continued litigation of the PCR application would violate Rule 11 of the Superior Court Rules of Civil Procedure. See Campbell, 56 A.3d at 455-56 ("The procedure set forth in Shatney simply applies Rule 11's proviso to the context of the postconviction remedy, such that an attorney * * * appointed to represent an indigent applicant may withdraw from that representation when it becomes clear, after a reasonable investigation, that some or all of the applicant's claims lack merit."). In other words, Shatney was not meant to water down the quality or extent of the legal representation that § 10-9.1-5 clearly grants to an indigent PCR applicant.

In the sixteen years since Shatney was decided, the procedures that have arisen scarcely resemble what was envisioned by the Shatney Court. A veritable cottage industry has arisen whereby court-appointed lawyers are proceeding as if charged with screening out meritless applications for the ax of summary dismissal. Along the way, Shatney has been transmuted from an interpretive effort to achieve coexistence between § 10-9.1-5 and Rule 11 into a high hurdle that PCR applicants must surmount in order to receive serious consideration of their claims on

the merits. Our decision in Campbell, which the majority characterizes as the most egregious example of how Shatney has evolved, is by no means an outlier. See, e.g., Garcia v. State, 91 A.3d 359, 359-60 (R.I. 2014) (mem.); Motyka v. State, 91 A.3d 351, 351-52 (R.I. 2014) (mem.); Ramirez v. State, 89 A.3d 836, 838-40 (R.I. 2014); Rodriguez v. State, 86 A.3d 393, 393 (R.I. 2014) (mem.); Fortes v. State, 65 A.3d 478, 478 (R.I. 2013) (mem.). This Court's concerns about the denial of the right to counsel and an evidentiary hearing have caused us to modify Shatney's application to cases involving life without parole. See Tassone v. State, 42 A.3d 1277, 1287 (R.I. 2012). I am compelled to express my belief that the time has come to abrogate Shatney, at least as it relates to first-time applicants.[6] See Campbell, 56 A.3d at 458-59 (explaining important distinction between first application and subsequent applications with respect to right to appointed counsel under § 10-9.1-5).

I am mindful, however, that Shatney's life expectancy was not addressed by the parties in this case. I therefore proceed to analyze postconviction counsel's efforts under the existing regime, such as it is. In my opinion, the hearing justice erred in permitting postconviction counsel to withdraw pursuant to Shatney and in failing to reappoint counsel after the Cepeda statement was produced.[7] In order to conclude that Rule 11 required him to withdraw under the Shatney procedure, postconviction counsel must have reached the point that, in his opinion, Reyes's claims were not "well grounded in fact and * * * warranted by existing law or a good[-]faith argument for the extension, modification, or reversal of existing law." Rule 11 of

---

[6] As a member of the Shatney Court, I can state with confidence that "'[t]he matter does not appear to me now as it appears to have appeared to me then.'" McGrath v. Kristensen, 340 U.S. 162, 178 (1950) (Jackson, J., concurring).

[7] Following the majority's lead, I refer to the attorney who represented Reyes in connection with his 1994 plea of nolo contendere as "trial counsel," and the attorney who purported to represent him in connection with his PCR application as "postconviction counsel."

the Superior Court Rules of Civil Procedure. In his no-merit memorandum, postconviction counsel concluded that Reyes's claims of ineffective assistance of counsel were meritless because Reyes could not satisfy either the performance or prejudice prong of Strickland. In my opinion, postconviction counsel's efforts on Reyes's behalf were insufficient to justify this conclusion. Indeed, postconviction counsel did not even speak with trial counsel.

Assessment of whether an alleged ground of ineffective assistance of counsel meets the performance and prejudice prongs is a case-specific inquiry. In the past, this Court has not hesitated to vacate the summary dismissal of an applicant's claims of ineffectiveness where the record did not clearly support the conclusion that one of the prongs had not been met. See, e.g., Tassone, 42 A.3d at 1286 ("[T]he absence of a transcript, coupled with the lack of an evidentiary hearing, precluded the court from conducting an adequate, independent review of trial counsel's actions and from 'look[ing] at the entire performance of counsel.' * * * No evidentiary hearing was conducted to explore the validity of [the] applicant's arguments, thus leaving unexamined the foundation for a 'reasonable probability' that[,] but for trial counsel's errors, the result of the proceeding would have been different." (quoting Brown v. State, 964 A.2d 516, 528 (R.I. 2009))); Hughes v. State, 609 A.2d 943, 944 (R.I. 1992) ("No evidentiary hearing was conducted to explore the validity of [the applicant's ineffective-assistance-of-counsel] claims, thus leaving unexamined the foundation for a 'reasonable probability[]' [under the prejudice prong of Strickland]. The trial justice's ruling at the [PCR] hearing that he was satisfied that [the applicant] had failed to meet the necessary standards for relief under Strickland * * * was unfounded without an evidentiary hearing to buttress his conclusion."); see also Randall v. State, 609 A.2d 949, 950 (R.I. 1992) ("Since a claim of ineffective assistance of counsel raises questions of fact, disposition of such a case by way of summary judgment is not possible.").

In my view, postconviction counsel was overeager in labeling Reyes's claims as meritless. Critically, Reyes's 1994 conviction resulted from a plea of nolo contendere in the Superior Court to an amended charge of maintaining a narcotics nuisance. Because there was no trial, a trial transcript from which an assessment of trial counsel's efforts can be made is not available. Cf. State v. D'Alo, 477 A.2d 89, 91 (R.I. 1984) ("In determining whether a trial counsel's performance was effective, no evidence is more probative than the trial transcript, for through the transcript a trial justice hearing a petition for postconviction relief can observe, albeit second-hand, what actually happened as far as the trial counsel's actions are concerned. Accordingly, the trial justice hearing the petition in the present case had sufficient evidence before him to assess the performance of [the] defendant's trial counsel."). Although the four-page transcript of the change-of-plea colloquy was attached to Reyes's PCR application, the vast majority of Reyes's claims of ineffective assistance of counsel had nothing to do with trial counsel's actions or inactions at the plea hearing. The transcript sheds no light on the reasonableness of trial counsel's performance with respect to these allegations of ineffectiveness. Notwithstanding this deficiency, postconviction counsel elected not to confer, in any way, with trial counsel. Even more remarkably, he concluded that Reyes failed to satisfy the performance and prejudice prongs. In doing so, postconviction counsel failed to function as Reyes's attorney.

For starters, he made unfounded assumptions regarding trial counsel's performance and overlooked the fact that it was his job—in the course of fulfilling his duty to represent Reyes zealously—to determine if a nonfrivolous argument could be asserted that trial counsel's performance was unreasonable. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

- 33 -

time." Lynch v. State, 13 A.3d 603, 606 (R.I. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)) (emphasis added). By failing to even speak with trial counsel, postconviction counsel wholly failed to perform this fair assessment. Instead, he simply assumed that trial counsel rendered effective assistance. For example, he speculated that trial counsel "had a good understanding as to the state of the evidence against his client." How do we know that from this record? Likewise, he stated that trial counsel "was not provided concrete information that there was additional exculpatory evidence other than what already existed." I see no evidentiary support for this statement in the record. The undeniable fact that postconviction counsel simply was assuming away the critical issue of whether trial counsel's performance violated the Strickland standard is evident from the following passage of his no-merit memorandum:

> "In the absence of any evidence to the contrary, it is fair to assume that Reyes'[s] counsel complied with his responsibilities as an attorney concerning open and honest communications with his client, and that he communicated with his client in a means efficient enough so that they had meaningful discussions regarding the case." (Emphasis added.)

Fair to whom? Certainly not to Reyes, his client, who was owed a duty of zealous advocacy. In the absence of at least a conversation with trial counsel, postconviction counsel's conclusion that Reyes's claims were meritless must be recognized for what it is: a premature effort to withdraw from the case.[8] Cf. Tassone, 42 A.3d at 1286 ("[T]he absence of a transcript, coupled with the

---

[8] These are not merely isolated passages in postconviction counsel's no-merit memorandum. Rather, the notion that trial counsel must have rendered effective assistance of counsel is a theme that permeates the entirety of the memorandum. See, e.g., Postconviction Counsel's No-Merit Memorandum at 25 ("[Reyes] was represented by very competent defense counsel who obviously did not feel that the services of an interpreter were necessary in order for his client to understand the plea colloquy with the [c]ourt." (emphasis added)); id. at 15 ("Reyes has not presented any evidence to prove that his attorney acted in anything other than a competent manner."); id. at 19 ("In and [of] itself[, trial counsel's failure to file a pretrial discovery motion]

lack of an evidentiary hearing, precluded the court from conducting an adequate, independent review of trial counsel's actions and from 'look[ing] at the entire performance of counsel.'" (quoting Brown, 964 A.2d at 528)).

At the hearing on the motion to withdraw, postconviction counsel explained that he "did not feel it was necessary to speak to [trial counsel]" because he concluded that Reyes entered into a knowing and voluntary plea. However, the fact that the 1994 plea may have been voluntary, knowing, and intelligent does not bar claims of ineffective assistance of counsel relating to trial counsel's advice leading to the decision to enter the plea. See State v. Dufresne, 436 A.2d 720, 722, 723 (R.I. 1981) ("The focus of a postconviction inquiry when there has been a guilty plea is the nature of counsel's advice concerning the plea and the voluntariness of the plea. * * * A defendant who pleads guilty on the advice of counsel must demonstrate at his postconviction hearing that that advice was not within the range of competence demanded of attorneys in criminal cases."). Reyes's claims attack the effectiveness of trial counsel in advising him to enter a plea of nolo contendere. Therefore, the fact that Reyes's plea was otherwise voluntary, knowing, and intelligent was no excuse for postconviction counsel's failure to speak with trial counsel.

Postconviction counsel alluded to a second reason for not interviewing trial counsel: that, irrespective of whether Reyes could satisfy the performance prong, he was unable to satisfy the

does not mean that counsel was anything less than diligent in his representation of [Reyes]; there are many reasons why counsel might elect not to file for discovery. In many cases, it is because counsel might not want to file an Answer to the State's Motion for Reciprocal Discovery, thereby having to give to the [s]tate any evidence that they might not want to divulge." (emphases added)); id. at 9 ("I should point out that the defense counsel in this case was, and is, a very experienced and respected member of the defense bar who has represented hundreds of criminal defendants in all levels of the judicial system, both [s]tate and [f]ederal. He enjoys a well-deserved reputation as a hard[]working, top-notch criminal defense attorney who is not afraid to try a case in front of a jury."); id. at 28 ("It is difficult to second guess the work of an attorney when there was a negotiated plea.").

prejudice prong because of the highly favorable disposition of the charges. To be sure, this Court previously has explained that, "when counsel has secured a shorter sentence than what the defendant could have received had he gone to trial, the defendant has an almost insurmountable burden to establish prejudice." Neufville v. State, 13 A.3d 607, 614 (R.I. 2011). The assessment of the strength of a negotiated agreement, however, cannot occur in a vacuum. The need for a conversation with trial counsel flows in no small part from the unique relationship between the facts of this case and the amended charge to which Reyes pled. Anyone familiar with the disposition of criminal cases in this state would recognize that the plea agreement in this case—in which, based on a single delivery of heroin, a two-count criminal information charging distribution of heroin within three hundred yards of a school and conspiracy to commit that offense was amended to a single count of maintaining a narcotics nuisance—was not a typical disposition. A conviction for maintaining a narcotics nuisance under G.L. 1956 § 21-28-4.06(b)(1)(a) requires proof of "acts [that] are recurrent or of [a] habitual nature"; a single drug transaction is an insufficient basis upon which to convict for this offense. State v. Reis, 430 A.2d 749, 753 (R.I. 1981); see id. at 754 ("[Section] 21-28-4.06 requires a showing of more than an isolated instance of the prohibited activity."); see also id. at 753, 754 (reversing the defendant's convictions for maintaining a narcotics nuisance where "[t]here was absolutely no evidence, apart from this single incident, that [the] defendant used his apartment or his car for the unlawful keeping or sale of a controlled substance." (emphasis added)). Accordingly, the single drug buy set forth in the criminal information was insufficient as a matter of law to constitute the offense of maintaining a narcotics nuisance. This fact should have alerted postconviction counsel of the need to consult trial counsel.

The disposition in this case might have been highly favorable if the state's evidence was strong and Reyes had little in the way of a defense. On the other hand, the negotiated plea agreement appears less favorable if the state's evidence was weak, Cepeda is deemed a credible witness, and exculpatory evidence exists and is sufficiently persuasive to create a reasonable probability that the outcome of the trial would have been an acquittal. When compared to an acquittal, the disposition in this case—even without jail time—loses much of its luster; it operated as a felony conviction, it carried a term of probation (the violation of the terms and conditions of which landed Reyes in prison), and it served as one of the predicate offenses that qualified Reyes as a habitual offender. It is therefore unsurprising that the assessment of the strength of the disposition in relation to the prejudice prong of Strickland is not often made at the summary-dismissal stage. See Neufville, 13 A.3d at 611, 614 (commenting on the effect of a shorter sentence on the prejudice prong in a case where an evidentiary hearing was held and findings of fact were made); Rodrigues v. State, 985 A.2d 311, 316, 317 (R.I. 2009) (similar); Hassett v. State, 899 A.2d 430, 436-37 (R.I. 2006) (similar); cf. Tassone, 42 A.3d at 1286 ("No evidentiary hearing was conducted to explore the validity of [the] applicant's arguments, thus leaving unexamined the foundation for a 'reasonable probability' that[,] but for trial counsel's errors, the result of the proceeding would have been different."). Consequently, postconviction counsel's premature assessment of the strength of the disposition did not justify his failure to interview trial counsel.

In granting postconviction counsel's motion to withdraw, the hearing justice failed to set forth her reasons for accepting his assessment of Reyes's claims as meritless. Indeed, the hearing justice notified Reyes that she was "not determining whether or not there's merit to your case." (Emphasis added.) This is error. There is no showing on this record that the hearing

justice conducted the independent review that <u>Shatney</u> requires as a prerequisite to permitting counsel to withdraw; in fact, she declared just the opposite. See <u>Shatney</u>, 755 A.2d at 135 ("If, <u>based upon its review</u> of counsel's assessment of the potential grounds for seeking post[]conviction relief and of any other issues that the applicant wishes to raise, <u>the court agrees that those grounds appear to lack any arguable merit</u>, then it shall permit counsel to withdraw * * *." (emphases added)). Without a finding that the grounds set forth in the application lack any arguable merit—which, in my opinion, could not be made when no effort was made to contact trial counsel—the hearing justice should not have permitted postconviction counsel to withdraw.

In sum, postconviction counsel failed to appreciate his role as <u>Reyes's</u> attorney, and the hearing justice erroneously granted him a free pass in permitting him to withdraw from the representation. This case is yet another example of the injustice that can accompany the <u>Shatney</u> procedure, which operates simultaneously as an additional court-made hurdle for PCR applicants to overcome and a mechanism for less-than-full-fledged representation of indigent applicants. Indeed, had Reyes received the counsel envisioned by § 10-9.1-5—to which he was undeniably entitled—his counsel likely would have recognized the "maladies" of the Cepeda statement and rectified them to ensure that Reyes received full and fair consideration of his constitutional claims.

### Consideration of the Cepeda Statement

The hearing justice's error in granting postconviction counsel's motion to withdraw, standing alone, supplies adequate and persuasive grounds to vacate the summary dismissal of Reyes's claims of ineffective assistance of counsel. Nonetheless, I proceed to note my

disagreement with the majority's incongruous decision to affirm the hearing justice's summary dismissal of the application on the ground that she erred in considering the Cepeda statement.

Immediately after the hearing justice granted postconviction counsel's motion to withdraw, Reyes moved for funds to hire a private investigator. Reyes explained that, because "the records [of the alleged exculpatory testimony of one of his accomplices] are nowhere to be found," "the investigator would only need to get the testimony from the witness." The hearing justice denied the motion. She then warned Reyes that, "unless there is something of great significance in your memorandum that persuades the [c]ourt that you would have gone to trial and the result would have been different, then the [c]ourt may very well be dismissing your case."

Against all odds, Reyes—who remained incarcerated, indigent, and uncounseled— persuaded Nicholas Cardarelli (Cardarelli), a private investigator and notary public in this state, to work on his behalf in an effort to come forward with "something of great significance." He did so. Cardarelli tracked down Cepeda and took a statement from him that directly bears on the question of Reyes's innocence. Reyes produced the Cepeda statement at the next hearing, before the state filed—at the hearing justice's suggestion—its motion for summary dismissal under § 10-9.1-6(c). Although noting certain "infirmities" of the Cepeda statement, the hearing justice explicitly considered it: "On the basis then of the application, all of the materials that have been submitted, including, for what it's worth, the statement by Mr. Cepeda, that is not a sworn statement or an affidavit by Mr. Cepeda, the [c]ourt finds that there is no need to proceed further." (Emphasis added.) The majority declares that the hearing justice erred in considering the statement because it concludes that the Cepeda statement "is riddled with maladies that

- 39 -

barred it from the hearing justice's consideration on summary dismissal." In my opinion, this conclusion is erroneous on at least three independent grounds.

First, the majority treats the Cepeda statement as if it were submitted in opposition to the state's summary-dismissal motion. It was not. The Cepeda statement was submitted in response to the hearing justice's notice, required by statute, of her intention to dismiss Reyes's application and her corresponding warning that she would dismiss the application unless Reyes came forward with "something of great significance." See § 10-9.1-6(b) ("When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post[]conviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing."). At the time that Reyes produced the Cepeda statement, the state's motion for summary dismissal under § 10-9.1-6(c) had not yet been filed. Therefore, the majority's conclusion that the Cepeda statement could not be considered by the hearing justice because it is not the type of admissible evidence that can competently defeat a summary-dismissal motion flows from an erroneous starting premise.

Because the Cepeda statement was submitted in response to the hearing justice's notice of proposed dismissal under § 10-9.1-6(b), that statutory section—and not the requirements of Rule 56(e) of the Superior Court Rules of Civil Procedure and this Court's summary-judgment case law—governs its consideration. In my opinion, the hearing justice, after reviewing the Cepeda statement (which exculpates Reyes), should have realized her mistake in allowing postconviction counsel to withdraw and directed that further proceedings occur at which—at a minimum—Reyes would be provided with an attorney willing to confer with trial counsel or with a view toward securing his testimony at an evidentiary hearing. See § 10-9.1-6(b) ("The

- 40 -

applicant shall be given an opportunity to reply to the proposed dismissal. <u>In light of the reply</u>, or on default thereof, the court may order the application dismissed or grant leave to file an amended application or <u>direct that the proceedings otherwise continue</u>." (emphases added)). Instead, the hearing justice invited the state to file a motion for summary judgment, considered the Cepeda statement, and concluded—erroneously, in my view, <u>see</u> <u>infra</u>—that it was irrelevant. The hearing justice's authority to consider the Cepeda statement was not restricted by this Court's summary-judgment jurisprudence because the state had not yet proceeded down that path.

Second, neither the state nor the hearing justice warned Reyes that the Cepeda statement could be rejected on the basis of the so-called maladies until, if at all, the very hearing at which his PCR application was summarily dismissed. The majority overlooks this aspect of the proceeding. When Reyes first produced the Cepeda statement, the hearing justice did not, in any way, suggest that it could be rejected on the basis of any defects; instead, she indicated that it might not be relevant. Nor did the state advocate rejection of the statement based on its defects. Instead, the state devoted a single paragraph to the Cepeda statement and proffered a merits argument:

> "As to the second document, the purported[ly] notarized (document does not contain a notary's seal or Mr. Cepeda's signature) statement of Ismael Cepeda, the [s]tate cannot speculate as to the purpose of this document. Mr. Cepeda testified at [Reyes]'s bail hearing, well prior to the resolution of the instant case (and, in fact, before [Reyes]'s charges were amended pursuant to his attorney's negotiations). Mr. Cepeda is not a 'previously unknown' witness, nor, by his own account, is Mr. Cepeda's statement different from that which he testified to at the bail hearing. * * * Therefore, without further clarification, the [s]tate cannot adequately respond."

Nothing in the above-quoted passage puts Reyes on notice that the state was advocating outright rejection of the Cepeda statement.[9] A hearing was required at this point.

In my opinion, the lack of any notice to Reyes is important in this case because he had no counsel and was expected to develop and litigate a fact-intensive claim concerning the deprivation of a fundamental constitutional right on his own, while incarcerated. Once forced to proceed pro se, Reyes ably attempted to address the concerns raised by the hearing justice and the state. When the hearing justice told him that he had better show her "something of great significance" or else face dismissal of his PCR application, Reyes produced the Cepeda statement. When the state argued that the Cepeda statement "does not contain a notary's seal or Mr. Cepeda's signature," Reyes attempted to address that concern too, correctly pointing out in a supplemental memorandum that the document does, in fact, contain Cardarelli's notary seal. Had Reyes been warned about the issues with the Cepeda statement before his application was summarily dismissed, he at least would have had an opportunity to remedy them. The hearing justice did not afford Reyes such an opportunity because she did not reject the document. Both Reyes and his appellate counsel have been blindsided in this Court—after oral argument—by the holding of the majority: that, contrary to the understanding of all involved, the hearing justice was "barred" from considering the Cepeda statement.

---

[9] In fact, to the extent that the state intended to make such an argument, its attempt to do so was wholly ineffectual to preserve the argument for our review. Perhaps in light of its failure to preserve the argument that the Cepeda statement could not be considered by the hearing justice, the state on appeal simply highlights in a footnote the infirmities of the Cepeda statement that were noted by the hearing justice. To its credit, the state does not attempt to revive an argument that was not clearly and distinctly made below. The majority is raising sua sponte a ground of decision that was not addressed in the Superior Court. In my opinion, it is not the function of this Court to launch a rescue mission to resurrect an argument that was abandoned in the proceedings below.

- 42 -

Finally, the majority improperly attributes to Reyes—an indigent prisoner forced to proceed pro se—the error of a registered notary public of this state that is squarely within the notary's expertise.[10]  Under these circumstances, Reyes cannot be expected to recognize that the Cepeda statement was improperly notarized.  This is a fiction that I refuse to embrace.  The majority relies upon the notary's mistake and, on that basis alone, has foreclosed consideration of the merits of Reyes's claims that his fundamental constitutional right to effective assistance of counsel has been violated.   This is not a just result.

For all of these reasons, I am of the opinion that the conclusion of the majority that the hearing justice was barred from considering the Cepeda statement was erroneous.[11]

### Relevancy of the Cepeda Statement

Finally, I note my disagreement with the hearing justice's conclusion that the Cepeda statement was not relevant to the charge to which Reyes pled and her decision that summary dismissal of Reyes's claims of ineffective assistance of counsel was proper because Reyes was unable to satisfy the prejudice prong of Strickland.  Contrary to the hearing justice's assessment, the Cepeda statement is relevant to the prejudice prong.  It specifically relates to the criminal

---

[10] The majority concedes that the Cepeda statement's infirmities are the result "of the notary's disregard for his duties."

[11] The majority charges me with "suggest[ing] that we turn both our existing postconviction relief case law and [G.L. 1956] § 10-9.1-6(c) on its head" and that "the system should bend over backwards for an applicant" in the circumstances of this case.  In my opinion, postconviction counsel did not comply with § 10-9.1-5.  Under "our existing [PCR] case law," it was reversible error to enter a summary dismissal before Reyes received the assistance of counsel to which he was statutorily entitled.  See Campbell v. State, 56 A.3d 448, 458-62 (R.I. 2012).  To the extent that the system permits the summary dismissal of the ineffective-assistance-of-counsel claims of a first-time, pro se applicant who has been deprived of counsel and who nonetheless comes forward with evidence suggesting actual innocence, the system is broken.  It should bend backwards, forwards, and every other conceivable way so that the applicant receives his day in court.  To hold otherwise turns the postconviction remedy enacted by the General Assembly into an illusion.

conduct giving rise to the offense to which Reyes entered a plea of nolo contendere. The statement of facts read in support of the amended charge was as follows: "Pedro [Reyes] on or about the 5th day of October 1993 at Central Falls in the County of Providence did maintain a narcotics nuisance in violation of the Rhode Island General Laws." It is clear that the amended charge arose from his arrest and prosecution for the acts that gave rise to the two counts of the criminal information. Because the Cepeda statement concerns—and purports to absolve Reyes from—that conduct, it is relevant to the amended charge.[12]

The Cepeda statement creates a genuine issue of fact as to whether at least one of Reyes's codefendants in the 1994 case gave exculpatory testimony—during a bail hearing or elsewhere—of which trial counsel knew or should have known. Maybe Cepeda did so testify. Maybe trial counsel discussed this circumstance with Cepeda and his client. Maybe the state amended the charges because of this circumstance. Postconviction counsel's investigation indicated that the alleged exculpatory bail-hearing testimony did not exist. However, the Cepeda statement, although it does not specifically mention bail-hearing testimony, indicates that Cepeda gave testimony at a judicial proceeding that tended to exculpate Reyes from the charged offenses. Therefore, at the time that Reyes's application was summarily dismissed, there was a genuine issue of fact as to whether Cepeda provided exculpatory evidence. See Bucci v. Hurd Buick Pontiac GMC Truck, LLC, 85 A.3d 1160, 1175 n.7 (R.I. 2014) ("A 'genuine' issue is one that

---

[12] I also note that, even if the Cepeda statement related only to the original charges, it would still be relevant to the prejudice inquiry. In the plea context, the prejudice prong requires a defendant to "'demonstrate a reasonable probability that[,] but for counsel's errors, he or she would not have pleaded guilty [or nolo contendere] and would have insisted on going to trial' and, importantly, that the outcome of the trial would have been different." Neufville v. State, 13 A.3d 607, 610-11 (R.I. 2011) (quoting State v. Figueroa, 639 A.2d 495, 500 (R.I. 1994)); see also Lopes v. State, 111 A.3d 344, 349 (R.I. 2015). If trial counsel had advised Reyes not to enter his plea because of the exculpatory testimony of his codefendants, as Reyes alleges should have been done, and Reyes followed this advice, he presumably would have gone to trial on the original charges.

- 44 -

could be resolved in favor of either party * * *." (quoting <u>Calero-Cerezo v. United States Department of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004))).

This genuine issue concerned a fact that is, at least at this early juncture, material to the prejudice inquiry. If the exculpatory testimony exists, it bears on the question of whether, if Reyes had proceeded to trial on the original charges, he would have been acquitted. From my review of the record, it appears that the only evidence linking Reyes to the charged offenses was Carl Barovier's eyewitness identification of Reyes as the driver of the Datsun from which Cepeda emerged with heroin. There is no indication from the police reports that accompanied the criminal information that the driver ever exited the vehicle, nor is there information about the length of time that and the distance from which Barovier observed the driver, the lighting, his degree of certainty, or the time that elapsed before Barovier identified Reyes. Moreover, Barovier did not identify Reyes from a photo lineup; instead, when Edward Randall (Randall) provided Barovier a show-up photograph of Reyes—which Randall had selected based on Barovier's description of the driver as having "light[-]black skin" and appearing to be "approximately 5'8" tall[ and] between 19 and 23 years of age"—Barovier identified him as the man he saw driving the vehicle.[13] Contrary to the account that Barovier provided in the police reports, however, the Cepeda statement indicated that Reyes was not involved in the drug deal in question. In particular, the Cepeda statement asserts that Cepeda testified that he and Reyes did

---

[13] Recently, this Court recognized "the problematic nature of eyewitness identification and its potential for misidentification," <u>State v. Davis</u>, 131 A.3d 679, 696 (R.I. 2016), and "the growing concern in other jurisdictions with reliance on eyewitness identification testimony, the growing body of scientific and psychological studies regarding the questionable accuracy of the accounts of eyewitnesses, and the efforts made to prevent a miscarriage of justice," <u>id.</u> at 696 n.13. We therefore announced that, henceforth, "the better practice would be for courts to provide the jury with more comprehensive instructions when eyewitness testimony is an issue, similar, for example, to those that were imparted in [<u>State v. </u>]<u>Austin</u>, 114 A.3d [87,] 92-93 [(R.I. 2015),] and [<u>State v. </u>]<u>Figuereo</u>, 31 A.3d [1283,] 1290-91 [(R.I. 2011)]." <u>Davis</u>, 131 A.3d at 697.

not engage in drug transactions with one another as a general matter and that Reyes was not with him when he sold the heroin to Barovier. Therefore, because the Cepeda statement tended to discredit the accuracy of Barovier's identification of Reyes, the existence of Cepeda's exculpatory testimony is a material fact that potentially bears on the resolution of the question of whether, had Reyes gone to trial, "the outcome of the trial would have been different." Neufville, 13 A.3d at 611; see Bucci, 85 A.3d at 1175 n.7 ("[A] 'material fact' is one that has the potential of affecting the outcome of the case." (quoting Calero-Cerezo, 355 F.3d at 19)).

Finally, I acknowledge that, even if Cepeda's exculpatory testimony does exist, the prejudice prong of the Strickland standard would not necessarily be resolved in Reyes's favor. To the contrary, several additional factors would first need to be considered, including an assessment of the circumstances under which the testimony was provided, Cepeda's credibility (or lack thereof), and the strength of the state's evidence against Reyes. In the end, Reyes would bear the burden of demonstrating the requisite prejudice.[14] See Strickland, 466 U.S. at 693. But the genuine issue of material fact as to whether Cepeda provided exculpatory testimony—as well as the additional considerations that flow from the resolution of that issue—cannot and should

---

[14] Even if Reyes were able to demonstrate prejudice under Strickland, he would still need to meet the performance prong to obtain postconviction relief. Additional questions would arise before trial counsel's performance could be deemed deficient, such as whether trial counsel knew or should have known of the existence of the exculpatory testimony, cf. Neufville, 13 A.3d at 611-12 (affirming the hearing justice's rejection of the applicant's claim that his trial counsel was ineffective because he failed to interview potential defense witnesses where, after an evidentiary hearing, the hearing justice supportably credited trial counsel's testimony that the applicant never disclosed any potential witnesses over the applicant's contrary testimony), and, if trial counsel had such actual or constructive knowledge, whether it was constitutionally deficient to nonetheless advise Reyes to accept the state's generous plea offer. Because the trial justice did not consider the performance prong and because the genuine issue of material fact as to whether the exculpatory testimony existed must be resolved before these additional questions can be answered, Reyes's claims cannot be summarily dismissed on the basis of an inability to satisfy the performance prong.

not be resolved at the summary-dismissal stage. See Doyle v. State, 122 R.I. 590, 594, 411 A.2d 907, 909 (1980); Palmigiano v. State, 120 R.I. 402, 406-07, 387 A.2d 1382, 1385 (1978).

Because this record demonstrates the existence of a genuine issue of material fact about the question of exculpatory testimony and because the resolution of that question could impact the resolution of the prejudice prong, summary dismissal under § 10-9.1-6(c) on the basis that Reyes failed to establish prejudice was, under the terms of that statute, impermissible.

## Conclusion

For all of these reasons, I would vacate the hearing justice's summary dismissal of Reyes's claims of ineffective assistance of counsel. It is my opinion that the hearing justice erred in granting postconviction counsel's motion to withdraw and that Reyes did not receive the assistance of counsel to which he was statutorily entitled. That alone warrants a remand for further proceedings. Moreover, the majority improperly concludes that the hearing justice was precluded from considering the Cepeda statement, which was undeniably relevant to Reyes's claims. The upshot of the majority's decision is that Reyes will not receive full consideration of the merits of the claimed violations of his fundamental constitutional right. Although Reyes may look to a more hospitable forum for adjudication of this claim, see Martinez, 132 S. Ct. at 1318, 1320, the merits should have been adjudicated in this jurisdiction. Instead, the one-two punch of the Shatney procedure, followed by an artificial application of this Court's summary-judgment standard to a document that was not submitted in opposition to a summary-dismissal motion, has rendered the postconviction remedy a nullity in this case. Consequently, I respectfully dissent.

# APPENDIX

|  |  |
|---|---|
| TIME: | 1:00 pm |
| DATE: | 12-9-13 |
| PLACE: | 215 Broadway Providence, RI |

PHONE: 401 475-7497

I, Ismael Cepeda, voluntarily, without threats or promises, make the following statement:

Q:     What is your name?

A:     Ismael Cepeda

Q: What is your date of birth:

A: 11-24-72

Q:     What is your present address:

A:     Pawtucket, Rhode Island

Q: What is your occupation?

A: Un-employed

Q:     Ismael, tell me what happened that day in December 1993 when suspected heroin was purchased at the corner of Illinois and Summer Streets in Central Falls, RI?

A:     Basically, easy man, I got arrested, I got charged, I ended up doing time, all of a sudden they came up with this one charge that has to do with him, Pedro, so I'm like, okay, they were trying to say that I made a deal with him or something like that which is a lie. I didn't mind going to court on it because I never dealt with Pedro. Me and Pedro was never cool like that, I was never in his car, he was never in my cars so we never had the kind of deal as far as me and him going somewhere to make a deal, so undercover were trying to say that me and Pedro went once, I think it a brick of dope and then Pedro was with me in the car, we turned around, and that he got Pedro which was a lie so basically I

1

went to court, got on the stand, swore on the bible that I was going to say the truth and they asked me basically, it was a five minute thing. They asked me a few questions. They said, do you see the guy that you know, there was undercover, and right away, I actually say, if I saw him, I would know who he is after all these years later. And I pointed at him and I just said basically that he was lying, that I would never deal with, you know, I knew Pedro from around the way, that I knew him because he was from the same town where I was from and yeah, we did see each other at the clubs, and scenes like that but never, everything I admitted to, I said I did all my deals, I did them, I admit to all that, but I can't admit to something that I didn't do and I told them straight up I never dealt with this guy, me and this guy never hung in the car together, we never, you know, the times I sold to the undercover, I never sold with Pedro in the car with me, and basically that was it.

Q: Who was this, the AG strike force?

A: Yeah, I think so, yeah.

Q: Yeah, it was the AG strike force. So basically you had no dealings with,

A: No, never, Pedro was somebody like I said, C F is only so small, and we had our own little click, we did all the deals that we did and everything else that I already pled to and I did time for, everything did happen but as far as me and Pedro goes, we never, never, whatever they were trying to say about me being in the car, and went to see the undercover and sold to the undercover, that I got out of the car and Pedro stayed in the car, that's a lie. I don't know how they came up about that but I never, never and I will say it to this day, I never, me and Pedro never, I don't think me and Pedro ever got into the car together. We seen each other, yeah, he probably got out of the car once or twice

2

in the corner where we used to hang at but it was nothing like me and him being up and down the streets and hanging,, we never did that.

Q: Do you still live in Pawtucket?

A: Do I?

Q: Yeah.

A: Yeah. I was at the medium one back them and his lawyer went up to me and, I didn't' even know who he was but he told me the same thing you're telling me that how they were trying to put Pedro with me and I said yes, I'm willing to go to court, I went to court and I did the favor for him. Right now, I wouldn't mind doing the same thing, are they bringing him back to court?

Q: We're trying to find out what's going on with his case.

A: Basically, that undercover lied. Pedro never got out of the car, we never made it there together, like I said, I know him,, yeah, but because he's from around the way. Whatever I did, I did on my own. He had nothing to do with anything I did back then.

Q: Okay, that's about it?

A: Like I said, when I went to court, it was a five minute thing. It was quick. They just wanted to make sure that I knew what undercover was, who ws saying all these things, I called him a liar right on the stand. I said that guy right there is lying. I pointed my finger at him, I said undercover right there, and he's aliar. Me and this guy never did anything together.

Q: Do you remember who the undercover was?

A: I remember the face, the name, its been too long, I don't know. But like if I saw him at Walmart, I would know the face. He took years away from me. I got sentenced to two

3

years on that, I know who he was. I met him a few times. I think I had six deliveries and all that. He was somebody that would go to the corner and, he would go there with $500 to buy one brick, like who does that, you know. We were happy to see money. That's why he got so many people on that. He used to be one of the best customers coming over, undercover, you know, he was really doing the buys, paying top dollar for everything, so he got me and ten of my other friends.

Q: Okay, that's it for now.

A: You can always reach me. I'm always around.

Q: Okay, bye bye.

CONTINUATION WITNESS STATEMENT SHEET
SIGNATURE PAGE

I SWEAR THAT THE STATEMENT I JUST GAVE WAS THE TRUTH TO THE BEST OF MY KNOWLEDGE AND GIVEN WITHOUT ANY THREATS OR PROMISES.

*Recorded over Telephone*
WITNESS SIGNATURE

SUBSCRIBED AND SWORN TO BEFORE ME THIS......*10TH*......DAY

OF......*December*......, 2013.

*Nicholas Campbell*
NOTARY PUBLIC

COMMISSION EXPIRATION EXPIRES ON ...5/29/17......



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Pedro Reyes v. State of Rhode Island.

**CASE NO:**     No. 2014-161-Appeal.
(PM 12-4701)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  July 11, 2016

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

        Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

        For Applicant:  Camille A. McKenna
                Office of the Public Defender

        For State:   Virginia M. McGinn
                Department of Attorney General